BUTLER v. MAPLES.

1. An authority to an agent to buy cotton in a certain region and its vicinity, and to buy generally from whomsoever the agent, not his principals, might determine—one having in view not merely a single transaction or a number of specified transactions, but a class of purchasers and a department of business—makes a general agency to buy the cotton there, and if the agent, holding himself out as the general agent, purchase there under his power, he may bind his principal in violation of special instructions not communicated to his vendors, and of which they had neither knowledge nor reason to suspect the existence.

2. Where evidence showed that a region in the South which had been previously in possession of the rebel army, was evacuated by them, and that the citizens generally had taken the oath of allegiance or obtained protection papers, the grant of a permit by a proper treasury agent to purchase cotton authorized by treasury regulations, to be granted only in cases where the country was within the occupation of the military lines of the United States, raises at least a *primâ facie* presumption of the country's being within such occupation.

3. Where such permits were always in the same form, a printed one, and on a suit against a party to whom one has been granted, the permit granted to him has not been produced on call, the treasury agent who granted it may properly state its contents from his knowledge and recollection of them.

4. A treasury permit to a firm, to buy cotton, authorized them to buy through their agent.

ERROR to the Circuit Court for the Western District of Tennessee; the case was thus:

During the late rebellion, cotton having been an object whose acquisition was desired by the people of the North, its purchase within the Confederate lines was resorted to not unfrequently by a certain class of traders from the loyal States. Such trading was unlawful as trading with an enemy,

and was moreover made void by statute. But trading in a prescribed form, under certain conditions, within the insurrectionary region, if the same had been brought within the lines of the National military occupation, was made lawful by treasury regulation, if the trading was carried on under a permit from certain officers of the Treasury Department.

In this state of things one Shepherd, living in Desha County, Arkansas, a county in the east of that State and situate on the Mississippi, some distance below Memphis, Tennessee, made a purchase of 144 bales of cotton from a person named Maples, living not far from him; Shepherd *professing* in what he did to act in the name of a firm known as Bridge & Co., whose members were living and trading at Memphis, and which was composed of Butler and Hicox, with other persons.

At the time of this purchase Memphis was and had been for a long term in the quiet occupation of the Federal troops. "The Confederate forces had evacuated Little Rock, the capital of Arkansas, and all the country south of the Arkansas River, and had fallen back through the southwestern portion of the State to the Red River and into Texas. There was not an organized force of Confederates near the village of Red Fork, in Desha County, nor a Confederate post or force nearer than one hundred and fifty or two hundred miles from Red Fork. There were very few, if any, straggling soldiers in that portion of Arkansas on which Red Fork is situated. The citizens generally took the oath of allegiance to the United States, and many, if not most of them, procured what were called protection papers from the United States."

The cotton bought by Shepherd was bought by him as it lay, he agreeing to pay for it forty cents a pound as soon as it could be weighed. Having been weighed he removed fifty-four bales of it, but ninety bales were burned before it could be placed in a boat to be carried up the river. The fifty-four bales removed were got on board and sent to Bridge & Co., and Maples, the vendor, went to Memphis to see them. He saw Hicox, who wholly denied Shepherd's

agency, refused to pay anything for the cotton that was lost, but agreed to pay fifty cents a pound for these fifty-four bales that had arrived. Maples took this sum, supposing, as he alleged, that the assertions about Shepherd's want of authority were true, and only on that account. Seeing Shepherd afterwards, Shepherd informed him that they were not true, and Butler and Hicox still denying wholly Shepherd's authority to make the contract and to bind the firm, and still refusing to pay for the cotton that was burnt, Maples sued them in the court below to recover the price.*

On the trial it was testified to by one Carleton (under objection), that at this time he was the treasury agent, and that he had issued to the firm of Bridge & Co. a "permit" to purchase and transmit to market one thousand five hundred bales of cotton within the lines of Federal military occupation, first special agency. [The admission of his testimony was excepted to, both because the witness should have produced his official books, and because a permit to Bridge & Co. was none to Shepherd.] This agency included so much of the States of Alabama, Mississippi, Arkansas, and Louisiana, as was occupied by the National forces operating from the north. There was a printed form, as it appeared, invariably used. The defendant below did not produce this permit, though served with a notice to do so.

The evidence of Shepherd's authority to make the contract for the defendants and bind them to its performance, so far as it was direct, was of two kinds. The first and principal was an article of agreement, made on the 16th day of October, A.D. 1863, between Bridge & Co. and Shepherd, describing him as of Desha County, Arkansas. The agreement declared its purpose to be "purchasing R. C. Stone's and such other cotton as said Shepherd may be able to purchase in said county and vicinity, under the conditions and restrictions hereinafter set forth." Having thus declared its purpose, it recited that Bridge & Co. had furnished to Shep-

---

* The writ issued against others in addition to the two defendants named, but the others were not served with process and the issue was joined but between the plaintiff and Maples and Hicox.

herd $4000, and stipulated that they would furnish him such
other money from time to time as might be necessary to pur-
chase said cotton.   By the instrument it was further agreed
that Shepherd should buy the cotton, if it could be bought
at the price set forth therein, and as much more as he could
on the best possible terms, not paying *an average of more
than thirty cents per pound* for middling cotton, and lower in
proportion to the grade, to be delivered at such times and
places of shipment as might be agreed upon.   It was further
agreed that Shepherd should pay as little as possible on the
cotton until it should be delivered on a boat, or within pro-
tection of a gunboat, and that when thus delivered on the
boat and paid for, the property and ownership thereof should
vest exclusively in the said Bridge & Co., except as in the
agreement was provided for his share of the profits.   The
instrument then stipulated that Bridge & Co. should ship
the cotton to Memphis, sell it to the best possible advantage,
and, after reimbursing themselves the purchase-money, the
cost of hauling, shipping, drayage, commissions, &c., should
pay Shepherd one-eighth part of the net profits.   It also
provided that contracts, shipments, permits, &c., necessary
to purchase and get the cotton to Memphis, should be in
Shepherd's name, and that Bridge & Co. might thus use his
name when necessary.

The other direct evidence of the agency was supplied by
the testimony of one Martin, a witness for the defendants.
He was sent by them to Arkansas with money and instruc-
tions for Shepherd; the instructions being that he should
purchase cotton for the firm, but was not to agree to pay
more than from thirty to thirty-five cents per pound for it.
He might make small advances, but he was instructed not
to pay the balance of the purchase-money, or make it pay-
able, until the firm should be able to send a boat up the Ar-
kansas River for the cotton, and until it was in their posses-
sion, weighed, and placed on the boat.   He was directed to
take no risk for the firm of the destruction of the cotton by
incendiaries, or in any other way, except to the extent of the
money advanced.   There was other indirect evidence of

Shepherd's agency, to which it is not necessary now to refer. Clothed with such powers, and under such instructions, he bought cotton of divers persons (including the one hundred and forty-four bales bought of Maples) representing himself to be the agent of Bridge & Co., though not speaking of his written authority, or of any particular instructions.

The evidence being closed, the court charged the jury, and among other things said as follows:

"What is military occupation, is a question of law, to be decided by the court; and I instruct you, that if you believe the testimony in the case as to the location of Federal forces and garrisons in the region of country where the contract was made, and (as to the desire of the inhabitants) submitting to the authority of the government to restore their relations with the government, as manifested by their taking the oath of allegiance, and applying for and receiving 'protection papers,' then there was such a military occupation as is contemplated by the laws of Congress referred to.

"But in addition to this, the special agent of the Treasury Department, who was authorized to grant permits, exercised judicial functions in deciding what country was within the lines of military occupation; and when he granted a permit to buy cotton in a designated region, the permit itself was a decision by him that the region so designated was so occupied. When an officer of the government, thus clothed with judicial functions, grants a permit in the exercise of those functions, it would be very unjust to hold the party receiving the permit and acting under it responsible for that decision.

"These questions disposed of, the case is resolved into a question of agency. Now, did Shepherd have authority to bind defendants by that contract?

"A principal is bound by all that a general agent does within the scope of the business in which he is employed as such general agent; and even if such general agent should violate special or secret instructions given him by his principal and not disclosed to the party with whom the agent deals, the principal would still be bound if the agent's acts

were within the scope of the business in which he was employed, and of his general agency.

"However, a party dealing with a general agent, who seeks to hold the principal bound for the agent's acts or contracts, must show, in order to recover, that the agent held himself out as general agent, and that in fact he was such general agent.

"If Shepherd held himself out as the general agent of Bridge & Co., then the defendant is bound by the contract which he made with the plaintiff for the cotton, notwithstanding Shepherd may have agreed to pay more for the cotton than his principal had authorized; and if, as general agent for Bridge & Co., to buy cotton in Desha County, Shepherd was not authorized by Bridge & Co. to buy cotton except to be delivered on board the boat, and in violation of their instructions he did buy the plaintiff's cotton, and agreed to receive and accept delivery of it elsewhere than on the boat, unless the plaintiff knew of these instructions, the defendants are bound by the contract which Shepherd made, because it was within the scope of his general agency just as much as was the agreement to give for the cotton a larger price than that to which he was limited by the instructions of Bridge & Co.

"But it is said that the plaintiff agreed to rescind and abandon the contract made with Shepherd, and made a new contract with the defendant Hicox, by which he sold to Hicox the fifty-four bales of cotton not burned, at fifty cents per pound, and that this discharges the former contract made with Shepherd. The effect of the new contract must depend on the circumstances. If the plaintiff and Hicox came together, and made a contract about the fifty-four bales, when all the facts were known to the plaintiff; that is, if the plaintiff knew that Shepherd had exceeded his authority, and then made the new contract as proven, this new contract would discharge the defendant from the former contract between the plaintiff and Shepherd. But in order that the new contract might have this effect, the plaintiff must have known all the facts, all about Shepherd's authority; and if

not thus advised—if anything known to Hicox, which the plaintiff was entitled to know, was not disclosed to him—he was not bound by the new contract, and the defendant was not discharged from the old one."

The defendant excepted to the charge upon the following points:

1. That the written agreement or power of attorney introduced in evidence by plaintiff, established that Shepherd was the general agent of Bridge & Co.

2. That in granting the permit proved by Carleton, the treasury officer exercised judicial functions, and decided conclusively that the region of country to which the permit relates was within the lines of military occupation, and that as a matter of law, upon the proof in the case as to the condition of the country, and upon the permit granted to Bridge & Co., that Desha County was, at the date of contract, in November, 1863, within the lines of military occupation of National forces operating from the north.

That the court erred,

3. In the instruction given as to general and special agency, because the same was not applicable to the proof in the case, was irrelevant therefore, and calculated to mislead the jury; and also because, as abstract propositions of law, the instruction upon this point is erroneous.

4. In that part of the charge which relates to the new contract between Hicox and the plaintiff, by which Hicox bought the fifty-four bales of cotton at fifty cents per pound, and which stated to the jury the effect of the new contract.

Verdict and judgment having gone for the plaintiff, the defendants brought the case here on the exceptions to the evidence and to the charge.

*Mr. Palmer, for the plaintiff in error; Messrs. P. Phillips and D. McRae, contra.*

Mr. Justice STRONG delivered the opinion of the court.

At the trial it was, of course, incumbent upon the plaintiff to prove not only the contract of sale, but also that Shep-

herd, with whom the contract had been made, had authority
to act for and bind the defendants. Accordingly evidence
was submitted to show that the cotton was purchased by
Shepherd when professing to act as an agent for the defend-
ants. There was hardly any controversy about this fact, and
no questions are now raised respecting the competency or
sufficiency of the proof, or the manner in which it was sub-
mitted to the jury. But the authority of Shepherd to make
the contract for the defendants and bind them to its per-
formance was stoutly denied, and it is now strenuously in-
sisted that the court erred in the instructions given to the
jury respecting the evidence of his agency. The defendants
insist the court erred in charging that the written agreement
between him and Bridge & Co. constituted him their general
agent. We do not find that the court did thus instruct the
jury, though it must be admitted the charge may have been
thus understood. The jury was instructed that if Shepherd
held himself out as the general agent of Bridge & Co., the
defendants were bound by the contract he made with the
plaintiff for the cotton, though in making the contract he
transgressed the instructions he had received, and secret
limitations of his authority, which instructions and limita-
tions were not revealed to the plaintiff. It is true, as has
been noticed, there was other evidence of a general agency
beyond that which the agreement furnished, but as it was
parol evidence, its force and effect were for the jury, and
hence the court could not rightly have charged that the de-
fendants were bound by the contract unless the agreement
did itself constitute Shepherd a general agent. But did it
not? The distinction between a general and a special agency
is in most cases a plain one. The purpose of the latter is a
single transaction, or a transaction with designated persons.
It does not leave to the agent any discretion as to the per-
sons with whom he may contract for the principal, if he be
empowered to make more than one contract. Authority to
buy for a principal a single article of merchandise by one
contract, or to buy several articles from a person named, is
a special agency, but authority to make purchases from any

persons with whom the agent may choose to deal, or to make
an indefinite number of purchases, is a general agency. And
it is not the less a general agency because it does not extend
over the whole business of the principal. A man may have
many general agents—one to buy cotton, another to buy
wheat, and another to buy horses. So he may have a gen-
eral agent to buy cotton in one neighborhood, and another
general agent to buy cotton in another neighborhood. The
distinction between the two kinds of agencies is that the one
is created by power given to do acts of a class, and the other
by power given to do individual acts only. Whether, there-
fore, an agency is general or special is wholly independent
of the question whether the power to act within the scope
of the authority given is unrestricted, or whether it is re-
strained by instructions or conditions imposed by the prin-
cipal relative to the mode of its exercise. Looking to the
agreement between Bridge & Co. and Shepherd, it can-
not be doubted that it created a general agency. It was a
delegation of authority to buy cotton in Desha County and
its vicinity, to buy generally, from whomsoever the agent,
not his principals, might determine. It had in view not
merely a single transaction, or a number of specified trans-
actions, which were in the mind of the principals when the
agent was appointed, but a class of purchases, a department
of business. It is true that it contained guards and restric-
tions which were intended as regulations between the par-
ties, but they were secret instructions rather than limitations.
They were not intended to be communicated to the parties
with whom the agent should deal, and they never were com-
municated. It was, therefore, not error to instruct the jury
as the court did, that the agency was a general one, and that
the defendants were bound by the contract, if Shepherd held
himself out as authorized to buy cotton, and if the plaintiff
had no knowledge of the instructions respecting the mode
in which the agent was required to act.

It may be remarked here that the reasons urged by the
plaintiffs in error in support of their denial of liability for
the engagements made by Shepherd are that he agreed to

pay forty cents per pound for the plaintiff's cotton; that he bought the cotton where it lay instead of requiring delivery on board a steamboat, or within the protection of a gunboat; and that he did not obtain a permit from the government to make the purchase. The argument is that in the first two particulars he transcended his powers, and that his authority to buy at all was conditioned upon his obtaining a permit from the government. All this, however, is immaterial, if it was within the scope of his authority that he acted. The mode of buying, the price agreed to be paid, and the antecedent qualifications required of him, were matters between him and his principals. They are not matters in regard to which one dealing with him was bound to inquire. But even as between Bridge & Co. and Shepherd a purchase at forty cents per pound was not beyond his authority. He was authorized to buy " on the best possible terms, not paying an *average* of more than thirty cents per pound." This contemplated his agreeing to pay in some cases above thirty cents. The average was regulated, but no maximum was fixed. Nor is there anything in the agreement that forbade his purchasing cotton deliverable at once where it lay, though not on a boat or in the protection of a gunboat. He was authorized to purchase deliverable at such times and places of shipment as might be agreed upon; that is, deliverable when and where it might be stipulated between him and the seller. True, he was to pay as little as possible until the cotton was delivered on a boat, or within the protection of a gunboat; and when thus delivered the property in the goods was to vest in the principals, excepting his share of the profits, but he was not prohibited from paying the whole price, or agreeing to pay the whole price, if insisted on by the vendor. The stipulation respecting the vesting of ownership was nothing more than a definition of right between him and his principals, as is manifested by the exception. Nor was Shepherd bound to procure a permit in his own name. He might have been had it been necessary, but if under the permit granted by Bridge & Co. he could purchase as their agent, it was all the agreement required.

It is further objected to the charge given to the jury respecting general and special agency, that it was not applicable to the proof in the case, and was therefore irrelevant and calculated to mislead the jury, and because, as stating abstract questions of law, the instruction was erroneous. If, in truth, it was irrelevant, it was not on that account necessarily erroneous and calculated to mislead the jury. We are not shown, nor do we perceive, how the jury could have been misled by it. They were instructed that, in cases of special agency, one who deals with the agent must inquire into the extent of his authority, but that a principal is bound by all that his general agent has done within the scope of the business in which he was employed, and this, though the agent may have violated special or secret instructions given him, but not disclosed to the party with whom the agent deals. Surely this was correct, and it was applicable to the evidence in the case. It has been intimated during the argument that the court should have added that no such liability can exist to one dealing with an agent with notice that the particular act of the agent was without authority from the principal. To this several answers may be made. The exception to the general rule, which it is said the court should have recognized, is implied in what the court did say. Again, there was no request for any such instruction; and still again, the evidence in the case did not demand it. There was no pretence that the plaintiff had any notice of secret instructions given to Shepherd, or of any limitations upon his authority. Nor was there anything that imposed upon him the duty of making inquiry for secret instructions or for restrictions. There were no circumstances that should have awakened suspicion. The plaintiff was not apprised that the authority was in writing. The argument is very far-fetched that infers a duty to inquire whether the agent had private instruction from the fact that the contract was made in a region that had been in a state of insurrection.

It is next insisted that the court erred in instructing the jury that in granting the permit to Bridge & Co. to buy cotton, the special agent of the treasury, who was author

ized to grant permits, exercised judicial functions, and decided conclusively that the district of country to which the permit extended was within the lines of Federal military occupation. This is not, however, quite an accurate statement of what the court did charge. The judge said, in effect, that the treasury agent, in granting the permit, exercised judicial functions, and that granting it was a decision by him that the region designated in it was within the lines of military occupation, but he did not say it was a conclusive decision. He did charge, as a matter of law, that "upon the proof in the case as to the condition of the country, and upon the permit granted to Bridge & Co., Desha County, Arkansas, was, at the date of the contract, in November, 1863, within the lines of the National forces operating from the north, and that the plaintiff and Shepherd had a right to make the contract for the sale and purchase of the cotton." The instruction was not based upon the grant of the permit alone. There was uncontradicted evidence in the case that, before the permit was granted, the part of the State in which Desha County is situated had been evacuated by the Confederate forces, who had retreated toward the Red River, and into Texas; that there were no such forces within from one hundred and fifty to two hundred miles from Red Fork, in Desha County, and that the military occupation of the National forces extended over the region. It was also proved that the citizens generally had taken the oath of allegiance, or obtained protection papers. Coupling these facts, about which there was no dispute, with the other fact that the treasury agent had granted a permit to Bridge & Co. to buy cotton there, the judge was not in error when he gave the instruction to which exception is now taken. It may be that the grant of the permit was not technically a judicial act, but it was an exercise of the treasury agent's judgment, and a deduction from the facts known by him, that the region over which the permit extended was within the military lines. It is to be presumed that he acted rightly, and as he could not lawfully grant the permit in the absence of such military occupation, his grant of it raised a presumption that

the occupation existed.   It established at least a *primâ facie*
case.   In *United States* v. *Weed*,* this court said, "The fact
that the proper officers issued these permits for certain par-
ishes, must be taken as evidence that they were properly
issued until the contrary is established." But a *primâ facie*
case, with nothing to rebut it, is a case made out.   If, then,
what amounts to military occupation, the facts being ascer-
tained, is necessarily a question of law, as must be conceded;
and if there was nothing to rebut the presumption of fact
arising from the grant of the permit, and no contradiction
or impeachment of the direct testimony, the court was jus-
tified in declaring, as matter of law, that Desha County was
within the lines of military occupation from the north, and
that the contract was not illegal.

The next objection to the charge may be disposed of in a
word.   Indeed, it has not been seriously urged here.   That
the defendants cannot set up a new contract, obtained by
one of them from the plaintiff for a sale of part of the cotton,
as a discharge from the contract made for them by Shepherd,
if the new contract was obtained by their own misrepresen-
tations, or by their denial of Shepherd's agency, is too plain
to need discussion.   And yet, that they may, must be main-
tained by them in order to convict the court below of error
in the instructions given respecting the new contract.

A single exception remains to be considered.   It is to the
admission of the testimony of Carleton.   He was introduced
to prove that he, as special treasury agent, had issued a per-
mit to Bridge & Co., and to prove its contents, notice having
been given to the defendants to produce the permit itself,
and they having failed to do so.   It is objected, first, that his
official books should have been produced, and that it was
incompetent to prove the permit in any other way.   The
permit itself would have been the best evidence; but it was
not produced on call, and therefore secondary evidence was
admissible.   There are no degrees of such evidence, and the
official books of the treasury agent, had there been any in

---

* 5 Wallace, 73.

existence, would have been at best but secondary proof, of no higher order than was the testimony of a witness. There was, also, no proof that any such books had been kept, and consequently nothing to show that there was any better evidence than that which was offered. Another objection was made against its subject-matter. It was, that the permit, of which the proof was offered, was to Bridge & Co., and not to Shepherd. We do not perceive any merit in this objection. We have already said that, in the agreement between him and his principals, Shepherd did not undertake to procure a permit unless it should be necessary to buy cotton and get it to Memphis, and we do not perceive why a permit to Bridge & Co. did not enable them to buy through an agent, and render any permit to their agent unnecessary. For these reasons, the objections urged against the admission of the testimony of Carleton cannot be sustained.

JUDGMENT AFFIRMED.