## BLUMENTHAL et al. v. SHAW.

(Circuit Court of Appeals, Third Circuit. January 6, 1897.)

No. 10.

1. APPRENTICES—DISCHARGE—PREVENTING OTHER EMPLOYMENT—DAMAGES.

One S. was in the service of B. & Co., morocco manufacturers, as an apprentice, under indentures supposed to be, and treated by both parties as, valid, but which in fact were not. In consequence of some dissatisfaction, B. & Co.'s foreman discharged S.; and, although the foreman afterwards testified that he expected him to come back, S. was not so informed, and sought work in other factories. P., superintendent for B. & Co., who was in general charge of their business at the place where their factory was situated,—the members of the firm residing elsewhere,—then notified the other morocco manufacturers in the same place that S., their apprentice, had left without cause, and requested the other manufacturers not to employ him. Pursuant to an understanding among the manufacturers of the place, they did refuse to employ S., and two who had employed him in ignorance of his identity discharged him at P.'s request, and S. was obliged to go elsewhere to obtain employment. *Held*, that S. was entitled to recover damages for the wrongful acts by which he was prevented from getting work.

2. SAME—ACTS OF MASTER'S AGENT.

*Held*, further, that as S. was supposed to be a runaway apprentice, who might lawfully be reclaimed, and whom others had not a right to employ, the acts of P. were within the scope of his employment, and B. & Co. were liable for such acts.

In Error to the Circuit Court of the United States for the District of Delaware.

Willard Saulsbury and Sol Kohn, for plaintiffs in error.

Samuel A. Macallister and Herbert H. Ward, for defendant in error.

Before ACHESON and DALLAS, Circuit Judges, and BUTLER, District Judge.

ACHESON, Circuit Judge. The view which we take with respect to the merits of this case renders it unnecessary for us to consider the motion to dismiss the writ of error. F. Blumenthal & Co., the defendants below, who were morocco manufacturers having their headquarters and residence in the state of New York, carried on a factory in the city of Wilmington, Del., through agents intrusted with the management of the same. Their superintendent of the Wilmington factory was Daniel Pierson, Jr., who had general charge of the concern. At this factory the plaintiff below, Mark A. Shaw, was in the service of the defendants, ostensibly as their apprentice. The defendants were the successors in business at the Wilmington factory of one Charles Mullin. On May 7, 1888, while Mullin was conducting the business, an agreement in writing was entered into between him (Mullin), Mark A. Shaw, the plaintiff, and Robert C. Shaw, the father of Mark, who was a minor, whereby Mark entered into the service of Mullin, as an apprentice, for a term of four years, to learn the trade of shaver. The parties to this agreement acted under it as if it were a valid statutory indenture of apprenticeship, although in fact it was not. When the defendants succeeded to the establishment, they took, by transfer from Mullin, whatever rights

he had under this paper, and the plaintiff, Shaw, remained with the defendants under the agreement; all parties treating it as a subsisting, valid indenture of apprenticeship. About the last of February, 1890, Cornelius Mundy, the defendants' general foreman, on account of some dissatisfaction with the plaintiff, ordered his discharge. The discharge, as communicated to Shaw by the boss shaver, was peremptory in terms; and the plaintiff, understanding it to be an absolute dismissal, left the establishment, and sought work in other morocco factories in Wilmington. Thereupon postal cards were sent out from the defendants' office, addressed to other morocco manufacturers in the city of Wilmington, containing this notification:

Wilmington, Mch. 7, 1890.

"Dear Sir: One Mark Shaw, an apprentice to us as a 'shaver,' left without cause and our notice. Please do not employ him.

"Yours, &c., Daniel Pierson, Jr., Supt.
"J. E. S."

There was an understanding or "unwritten law" subsisting among morocco manufacturers in the city of Wilmington that none of them would employ an apprentice belonging to another concern. It was shown that in two instances the plaintiff was dismissed from other morocco factories in Wilmington, where he had procured work, by reason of the claim set up by the defendants' superintendent, Mr. Pierson, that the plaintiff was the defendants' apprentice. Mr. Mc-Clary, a morocco manufacturer, testified:

"My recollection of the case is that I was called up on the telephone,—I answered the telephone,—and that Mr. Pierson, or a voice that I supposed to be Mr. Pierson's, asked me if this man [Shaw] was working for us. I told him 'Yes.' He said they claimed him as their apprentice."

In consequence of this claim, Mr. McClary discharged the plaintiff. Mr. Mitchell, another morocco manufacturer, testified:

"I was in F. Blumenthal & Co.'s office, and while there, in conversation with Mr. Pierson or Mr. Sparrow,—I could not tell which,—they told me we had Shaw working for us, and that he was an indentured apprentice of theirs; at least, they asked me if we had. I told him I did not know. Then they informed me that we had. I told them that when I went to the factory I would find out."

Immediately after this claim was made, and because of it, Mitchell dismissed Shaw. The plaintiff testified without contradiction that on one occasion, after he left the defendants' factory and was seeking work in Wilmington, he applied to Mr. Pierson for "discharge papers," and Mr. Pierson refused to give them to him. There was evidence to show that, in consequence of the claim thus asserted by the defendants' superintendent that the plaintiff was the defendants' apprentice, owing them service as such, the plaintiff was unable to obtain work at his trade in Wilmington, and was forced to go elsewhere to seek employment. Cornelius Mundy, the general foreman in the Wilmington establishment, who had reported to the office that McClary had "one of the firm's boys" (meaning Shaw), testified: "I considered him one of the apprentice boys. * * * We expected him to finish out his term. * * * It had never been the custom to employ other foremen's apprentice boys

in the leather business, and was not considered right." And he stated that the reason for this was "self-protection" in the trade. And, explaining what the plaintiff's so-called "discharge" meant, Mundy testified: "It is a way we had of disciplining apprentice boys. * ' * * We expected Shaw to come back." And the witness stated that he regarded Shaw as still an apprentice of the concern. No such explanation, however, was given to the plaintiff, and it seems that he never received any intimation from the defendants or their agents of their willingness to take him back.

This suit was a special action on the case to recover damages which the plaintiff suffered by the wrongful acts of the defendants in preventing his obtaining employment in his trade, and causing his dismissal from places where he had procured work. Undoubtedly, the declaration discloses a good cause of action, and the refusal of the court to give the jury instructions to the contrary was clearly right. The theory which the defendants' counsel advanced in the court below, and have pressed here, that the plaintiff's alleged grievance was the publication of a libel or the utterance of slander by the defendants' agents, is quite inadmissible, and the court committed no error in refusing to give to the jury the instructions based on that hypothesis which the defendants asked for. We do not concur in the suggestion that the court did not properly submit to the jury the question whether the acts of the defendants' agents complained of were done in the course of their employment, and within the scope of their agency. It seems to us that this question was clearly and fairly submitted to the jury.

A more serious question, and, we think, the controlling question in the case, is whether there was sufficient evidence to support the finding of the jury that the acts of Pierson and his subordinates were within the scope of their agency. Upon a careful consideration of the facts shown, we think that there was such evidence, and that the question was rightly submitted to the jury. The actual management of the defendants' factory at Wilmington was confided by the defendants to their superintendent, Mr. Pierson. The defendants themselves were nonresidents, and the general conduct of the business of the factory, including the supervision and control of the body of hands employed, was necessarily committed to their resident superintendent. As the representative of absent principals who had invested him with this general agency, he had implied authority to do those things in the course of the business which were appropriate and demanded by the occasion. Now, as we have seen, the plaintiff, Shaw, was ostensibly, although not legally, the apprentice of the defendants. Evidently, the plaintiff was regarded by the defendants' superintendent, Pierson, and his immediate subordinates, as lawfully bound to serve the defendants as such apprentice for the residue of a term which would not expire until May 7, 1892. For the claim set up by the defendants' agents there was certainly color of right. Undeniably, the claim was made in good faith, and in the interest of the defendants. Had the actual fact been as was supposed, the defendants themselves might rightfully have issued the postal notice which was sent out, and done the other acts which

Pierson and his subordinates did. To reclaim a runaway apprentice, and to notify the trade not to harbor him, is the right, and perhaps the duty, of the master. This case, then, is not one where an agent steps aside from his employment to gratify some personal animosity, or does an act which the principal, upon the supposed state of facts would not have been justified in doing. The exigency called for the exercise by Mr. Pierson of his best judgment in a matter affecting the interests of his principals, and connected with the business over which he had general authority. Whether Mr. Pierson was fully informed as to Mundy's action in the matter of the discharge of the plaintiff does not appear. It is very certain, however, that Mr. Pierson did not sanction the termination of the relation subsisting between the plaintiff and the defendants. His course of action, from first to last, proceeded upon the assumption and under the claim that the plaintiff was the lawful apprentice of the defendants. Had this really been so, the relation could not have been dissolved by the act of Mundy, even had the latter intended such a result, which he did not. Mr. Pierson, indeed, acted under a misapprehension as to the fact of the existence of an apprenticeship; but, if an agent, acting in the line of his employment and within the general scope of his authority, in the honest discharge of what he believes to be his duty to his principals in the particular circumstances in which he is required to act, makes a mistake, his employers are responsible. Wood, Mast. & Serv. §§ 280, 282, 288; Story, Ag. § 452.

The defendants were not entitled to the affirmance of their twenty-third point, which was based on the idea that the plaintiff's father was entitled to his son's earnings during his legal infancy. The emancipation of the son by the father, we think, clearly appeared. This suit was brought after the plaintiff became of age. It was not an action on a contract, but to recover damages for a tortious act. The instructions upon this branch of the case were right. We do not find in any of the assignments of error ground for reversal, and consequently the judgment is affirmed.