## In re DUNAVANT.

(District Court, W. D. North Carolina.    September 15, 1899.)

1. BANKRUPTCY—LIENS—TIME OF ATTACHING.
    The lien of a mortgage or deed of trust of realty, made and recorded more than four months before the filing of a petition in bankruptcy by or against the mortgagor or grantor, is not affected by his adjudication as a bankrupt.

2. SAME—LIEN OF JUDGMENT.
    Where, by the law of the state, the lien of a judgment attaches to all the real property of the debtor within the county where it is docketed, from the date of such docketing, such a lien, attaching more than four months before the filing of a petition in bankruptcy against the debtor, is not affected by his adjudication as a bankrupt.

3. SAME—ASSETS—RESULTING TRUST.
    Where a trust deed of land was given to secure the payment of a debt, and the trustee, in pursuance of the directions of the deed, made sale of the property on default of payment, and it was bid off by the creditor secured, for a price exceeding the aggregate amount of his own and a superior lien on the property, but no money was ever paid, and the trustee conveyed the property by deed to such purchaser, without collecting

the price bid, *held,* that such deed was unauthorized, and did not devest the title of the original owner of the property, but the latter had a resulting trust therein, such as might be subjected, under a decree in equity, to the payment of his debts, and which therefore would pass to his trustee in bankruptcy as assets of his estate.

4. SAME.

An interest in the nature of a resulting trust in realty owned by the bankrupt will pass to his trustee in bankruptcy for the benefit of his creditors, notwithstanding a previous levy of an execution on such interest and a sale thereunder, when by the law of the state a resulting trust is not such property as can be sold on execution.

5. SAME—ASSETS—EARNINGS OF MINOR SON.

Where a father, although himself insolvent, has expressly emancipated his minor son, the earnings of the latter thenceforward and during the remainder of his minority, or property purchased with the same, do not belong to the father, and cannot be claimed by his creditors as assets of his estate in bankruptcy.

6. SAME—FRAUDULENT CONVEYANCES—STATUTE OF LIMITATIONS.

Where, in proceedings in bankruptcy, creditors impeach a deed of land made to a son of the bankrupt, alleging that it was procured by the bankrupt as a means of defrauding his creditors, but an action to set aside such deed would have been barred by the statute of limitations in the courts of the state, before the adjudication in bankruptcy, the bankrupt may plead the statute in bar of the petition of such creditors.

7. SAME—NOTICE IMPUTABLE TO CREDITOR.

Where the state statute provides that an equitable action founded on fraud or mistake shall be barred within three years, but that the cause of action shall not be deemed to have accrued until discovery by the aggrieved party of the facts constituting such fraud or mistake, proceedings by creditors of a bankrupt to avoid a deed alleged to have been procured by the bankrupt as a means of defrauding his creditors will be barred by the statute, when the facts of the transaction were all known to their attorney more than three years before the filing of the petition in bankruptcy, the knowledge of the attorney being in this case imputable to his client.

## In Bankruptcy. *

The above-entitled cause having been referred to W. S. Pearson, a referee in bankruptcy in this district, to investigate, and to pass upon all matters in controversy between certain judgment creditors of S. D. Dunavant, bankrupt, and the bankrupt, and especially to report what, if any, interest the said bankrupt had at the date of his adjudication in bankruptcy (December 24, 1898) in certain lands described in the answers of the respondents, the referee, on due notice to all parties interested, examined the bankrupt and a number of witnesses at his office, in Morganton, N. C., on the 2d day of June, 1899, and from the evidence, duly recorded and herewith made a part of this record, found the following facts, to wit:

"That prior to the year 1890 the bankrupt, S. D. Dunavant, was the owner of a considerable amount of property, and, among other pieces of real property, he was the owner of the land in controversy, known as the farm on the Catawba river, situate in Burke county, consisting of 184 acres, and worth not more than $6,500 (sixty-five hundred dollars). That during said year of 1890 the said S. D. Dunavant borrowed $3,000, and in order to secure the said debt he executed a trust deed on said land to one Charles Root, and that the said debt, with a considerable amount of interest, is still due to the party to whom said trust deed has been assigned, and constitutes a first lien on said farm, and is no way affected by this proceeding in bankruptcy. That on the 1st day of June, 1891, the said S. D. Dunavant executed a deed conveying this land to S. T. Pearson in trust to secure certain indebtedness due the Piedmont Bank, and on the 5th day of September, 1892, he executed a second trust deed or mortgage to S. T. Pearson and W. C. Ervin on all his property, real and personal, except a homestead which had been assigned him in his life

estate in a house and lot in Morganton, and his personal property exemption, of less than $500 in value. This last-mentioned trust deed or mortgage was given for the benefit of the Piedmont Bank, the First National Bank of Johnson City, and others, and included the farm in controversy.

"I find that on the 7th day of August, 1893, the trustees, S. T. Pearson and W. C. Ervin, having first sold the other property conveyed in the trust deed to them, proceeded, under the power given them in said deed, to expose to sale the farm in controversy, subject to the Root mortgage of $3,000, and the same was bid off in the name of the Piedmont Bank at the sum of $6,000; that at the time of the sale of said farm the said S. D. Dunavant only owed the said Piedmont Bank the sum of $2,002, leaving a balance of $3,998 due on its said bid of $6,000, which should have extinguished the Root mortgage, according to the testimony of S. D. Dunavant; that the said trustees did not collect from the said Piedmont Bank the said sum of $3,998 due on its said bid as aforesaid, but chose to treat the transaction as if only $2,002 had been bid for said land, subject to the Root mortgage, and undertook on the day of said sale, to wit, the 7th day of August, 1893, to execute a deed to the said Piedmont Bank for said farm, reciting a consideration of $6,000, the exact amount bid for said land, but no part of which was paid in cash, as required by the terms of the sale and by the express terms of the trust deed under which the power was given; that a judgment was rendered in the superior court of Burke county, at term, on the 20th day of March, 1893, in favor of the respondent, S. M. Rice, and against the said S. D. Dunavant, for the sum of $1,878.70, with interest on $1,592.12 from said 20th day of March, 1893, till paid, and costs, and the same, having been thereupon docketed in the office of the clerk of said court, from thenceforth became and was a lien on all the real property of said bankrupt situate in said county, subject to a credit of $585.90 paid thereon August 5, 1896, and that the rendition and docketing of said judgment is prior in point of time to any judgment now subsisting against the said S. D. Dunavant.

"I find: That on the 30th day of December, 1893, S. T. Pearson contracted with H. J. Dunavant, then a minor, to take his notes, with father, S. D. Dunavant, as surety, for the sum of $2,002, as the purchase price of the land in dispute, subject to Root's mortgage, and Mr. Pearson, also acting as secretary, and G. P. Ervin, as president, of the Piedmont Bank, attempted to convey the farm in controversy, in the name of the said bank, to the said S. T. Pearson, upon the following trusts, to wit: 'That is to say, H. J. Dunavant, as principal, and S. D. Dunavant, as security, are indebted to the Piedmont Bank of Morganton in the sum of $2,002, evidenced by the two notes under seal, one note for $1,058, due on the first day of March, and one note for $944, due on the 30th day of June, 1894, both of said notes bearing 8% interest after maturity, and are, moreover, indebted to Bessie P. Hunt in the sum of $3,000, as evidenced by note of even date herewith, due one day after date, and bearing 8% interest from date. Now, therefore, this indenture further witnesseth that the said S. T. Pearson, trustee, may at any time sell any part of the tract above described, subject to the exception of 9½ acres as aforesaid, at either public or private sale, upon such terms and for such prices as to him may seem equitable and just, and apply the proceeds to the payment of said note and interest in such order as to the trustee may seem just, or to the payment of any note, principal and interest, given in renewal of said note, or any part thereof, after deducting costs of sale, including advertisement, surveyor and attorney's fees, together with 2½% commission to said trustee, and continue to make sale of said property from time to time, in the exercise of his discretion as aforesaid, until all said notes and interest are paid off and fully discharged, and, after the payment of all of the said debts and interest, shall hold the portion of said tract which he has not sold as aforesaid in trust for H. J. Dunavant, S. L. Dunavant, S. Dewitt Dunavant, Jr., and M. V. Dunavant, until such time as the said M. V. Dunavant shall attain the age of 21 years, at which time the part of said tract remaining unsold shall be conveyed by said trustee to said H. J. Dunavant, S. L. Dunavant, S. Dewitt Dunavant, Jr., and M. V. Dunavant, in fee simple, as tenants in common, with such warrants as under this conveyance he can give.' That the two notes signed by H. J. Dunavant as principal and S. D. Dunavant as surety,

specified in the said trust deed to S. T. Pearson, represented the exact amount which would have been due from S. D. Dunavant to the said Piedmont Bank, had there never been any sale of said farm under the trust deed executed by S. D. Dunavant to S. T. Pearson and W. C. Ervin as trustees. That on 30th of December, 1893, when said bank contracted with said H. J. Dunavant to sell farm to him for $2,002, and the Root mortgage, and convey the same to S. T. Pearson in trust as aforesaid, the said H. J. Dunavant was a minor under the age of 21 years, and that since that date the said H. J. Dunavant and S. D. Dunavant, as guardian for his children, have been in possession of said land as tenants of said trustee, and are now in possession under the said deed of December 30, 1893. That executions were issued from the superior court of Burke county, on certain judgments against said S. D. Dunavant in favor of S. M. Rice, T. I. Gillam, Smith, Courtney & Co., J. Allen Smith, and Slater, Myers & Co., on the —— day of ——, 1896, and levied upon the alleged interest of said S. D. Dunavant in the lands described, and the same was sold by the sheriff of Burke county on the 8th day of September, 1896, and said creditors procured J. T. Perkins, as trustee for them, to purchase the same for $500, and the said sheriff conveyed said land in fee simple to said Perkins by deed dated 17th of September, 1896, and registered 18th of September, 1897, in Book V, No. 2, page 467. That on the 18th day of September, 1897, the Morganton Land & Improvement Company conveyed to S. T. Pearson, trustee for H. J., S. L., S. D., Jr., and M. V. Dunavant, in consideration of $440, two tracts of land in Burke county, one tract containing 12½ acres, and the other tract containing 9½ acres, which deed is duly registered in Burke county, in Book E No. 2, page 379, February 9, 1898; and I find from the testimony of S. D. Dunavant that these tracts of land were purchased and paid for by H. J. Dunavant, then an adult, having attained his majority in July, 1896.

"I find from the testimony of S. D. Dunavant, H. J. Dunavant, and B. S. Gaither that in the year 1891 H. J. Dunavant was then sixteen years old, and, desiring to engage in business in Morganton on his own account, in buying and selling ice, he went to his father, S. D. Dunavant, and borrowed fifty dollars from him, and that his father said to him, 'You can have all from now on that you can make;' that he continued the business in 1892, with John Presnell as his partner, in the same manner; that in 1893 he worked as a commissary clerk on a railroad in Pennsylvania, at a salary of $50 per month, his name being on the pay roll, and he received and used his own wages, as other employés, with his father's knowledge and assent; that in 1893 and 1894 he worked as a commissary clerk for Dunavant, Corpening & Miller, on a railroad contract in Caldwell county, at a salary of $50 per month; that his name was on the pay roll, and he received and used his own wages, with the full knowledge of his father.

"I find that during the year 1894 S. D. Dunavant, who was a railroad contractor of long experience, obtained a contract for work on a railroad in Jamaica in the name of Dunavant & Co., and that he was insolvent at the time he took said contract; that he told H. J. Dunavant, who was then a minor, and up to that time had been working at $50 per month, that he would give him one-fourth of the profits on said work if he would accompany him to Jamaica, and accordingly the said H. J. Dunavant went with him to Jamaica, and did practically the same work there that he had been doing at other points for $50 per month; that within about six months H. J. Dunavant returned to the United States, leaving the said S. D. Dunavant in Jamaica; that when the said S. D. Dunavant returned, after seven or eight months' absence, he brought with him a draft for $7,000 on the New York Equipment Company, payable to himself individually, being one-half of the profits for the work done in Jamaica by Dunavant & Co., and that the said S. D. Dunavant indorsed said draft, and placed the same in the Piedmont Bank for collection, and that the same was collected, and he gave H. J. Dunavant a check for $3,246, which said H. J. Dunavant used in paying his notes given by him to the Piedmont Bank for the purchase money of the land described, and in part payment on the interest due on the Root mortgage.

"I find that said S. D. Dunavant was continuously insolvent from the time he took the contract for work in Jamaica, and before, up to and including the

96 F.—35

time when the profits of the said work, or a part thereof, were used for the purchase or relief of said land as aforesaid, and has continued insolvent ever since, and that all during these times the said H. J. Dunavant was a minor living with his father, and incapable of making any contract which would bind him, or of earning a legitimate salary of more than $50 per month.

"I find that the trust deed to S. T. Pearson, purporting to be for the benefit of the children of S. D. Dunavant, was not registered until the 17th day of December, 1897, more than four years after its attempted execution, and that the attempted acknowledgment of the said deed by the officers of said bank was made after the said bank failed, and a receiver had been appointed and taken charge of the affairs of said bank.

"I find as a fact from the testimony of S. D. Dunavant, and from the records on file in this proceeding, that immediately upon the appointment of his trustee in bankruptcy, on the 14th day of January, 1899, said bankrupt informed said trustee of the substantial facts in regard to said transaction, and of the conveyances, sales, etc., connected therewith, and caused his attorney to exhibit to said trustee said deed and conveyances connected with said transaction, and said trustee embodied said facts in a petition to the court, and asked for instructions as to his duties in the matter, and stated that he had investigated the matter fully, and was satisfied that said bankrupt had turned over all his property and had concealed nothing from him, the said trustee.

"I find that J. L. Anderson has agreed to bid as much as $50 for the interest of said S. D. Dunavant in said farm, whatever it may be, and that he is able to secure his said bid, and to indemnify the trustee, Manly McDowell, for the costs of making sale of the same; that the intestate of the respondent, J. L. Anderson, obtained judgments against the said S. D. Dunavant for the amounts set out in his petition and proof of claim, and the same were docketed in the superior court as set out herein; that the respondents have made due proof of their said claims before me as referee in bankruptcy, in the amounts set out in the schedule of said bankrupt, and as hereinbefore stated.

"I find as a fact that S. T. Pearson, trustee, and H. J. Dunavant knew of the price bid by the Piedmont Bank for the farm, and of the way the trustees, W. C. Ervin and S. T. Pearson, treated said bid, and what was done in regard thereto, and that they had notice of the failure of the bank to pay the price bid by it for the land, subject to the Root mortgage."

A. C. Avery and S. T. Pearson, for bankrupt.

Isaac T. Avery and W. C. Ervin, for creditors.

EWART, District Judge. Upon the above statement of facts as found, the referee concludes:

(1) "That, as a matter of law, a proceeding in bankruptcy does not affect liens accruing four months prior to petition filed, and that the trust-deed mortgage from Dunavant to Charles Root is a valid mortgage and first lien on the farm in controversy, in favor of the first holder thereof."

I approve this finding.

(2) "The referee further finds, as a matter of law, that a fiduciary making a sale under an instrument providing for such sale is only authorized to make title upon the payment of the price bid. I conclude, on the findings of fact, that the deed made by S. T. Pearson and W. C. Ervin to the Piedmont Bank on the 7th day of August, 1893, was unauthorized and invalid, and, the grantee having taken with notice of the failure of the Piedmont Bank to pay the price bid, the said deed did not operate to devest the title and interest of S. D. Dunavant in said farm, but the status theretofore existing between said Piedmont Bank and S. D. Dunavant still subsists, so far as said farm is concerned, and that S. D. Dunavant has a resulting trust therein, subject to the Root mortgage, liable to be subjected, under a decree, to the payment of his debts."

I approve this finding. Ex parte Macay, 84 N. C. 59; 16 Am. & Eng. Enc. Law, p. 805.

(3) "I find, as a matter of law, that the docketing of a judgment constitutes a lien on all real property of the judgment debtor in the county where the same is docketed, from the date of its docketing. I therefore conclude, on the finding of facts, that the judgment of S. M. Rice is a valid, subsisting, and first lien on the interest of the said S. D. Dunavant in the farm on the Catawba river, to the extent of his said interest as hereinbefore found, to wit, on his resulting trust therein."

I approve this finding. Code N. C. § 435.

(4) "I find that executions issued on the judgments of respondents, and the same were levied on the interest of said S. D. Dunavant in said farm, and at a sale under said execution on the 5th day of September, 1896, the interest of said S. D. Dunavant in said farm was sold by the sheriff of Burke county, and purchased by one J. T. Perkins as trustee for respondents. I find that, as a matter of law, that a resulting trust cannot be sold under execution under the laws of North Carolina, and that J. T. Perkins, trustee, took no estate under his deed from T. M. Webb, sheriff."

I approve this finding. Hardin v. Ray, 94 N. C. 456; Clark's Code (N. C.) § 450, subsec. 4.

(5) "I find, as a conclusion of law, that the services and earnings of a minor son, until he arrives at the age of 21 years, belong to his father, and, it having been shown that the purchase money, to wit, $2,673.36, paid for said land to said bank by H. J. Dunavant, was received by him from the profits of the work of Dunavant & Co. in Jamaica in 1896, before he had attained his majority; that by virtue of the law this money became the property of the father, and, being invested in said land, the land became the land of S. D. Dunavant, and the said S. D. Dunavant now owns said land, subject to the incumbrance of $3,000, and accrued interest, to Mary Sheafer, assignee of the Root mortgage; that the attempted emancipation of the son, H. J. Dunavant, by S. D. Dunavant, was not of sufficient notoriety to put creditors of S. D. Dunavant on notice that his earnings and profits were his own."

This conclusion of law I do not concur in. It appears from the evidence taken by the referee—not only of the bankrupt, but his son, H. J. Dunavant, and of other witnesses—that Dunavant, the bankrupt, had in the year 1891 emancipated his son, and has never since that date in any way interfered with his business, or received any benefit, profit, or share of his earnings. It further appears that the son, H. J. Dunavant, an active and energetic young man, had not only had the entire conduct and management of his own business, but was very often consulted by his father in the business affairs of the latter. At an early age as 20 he was a partner with his father in a railroad contract in Jamaica, out of which he made a large sum of money, and which, it appears from the evidence, he controlled absolutely, without any interference whatever on the part of his father. Browne, Dom. Rel. (a text prescribed by the supreme court of North Carolina) p. 79, says:

"The right of action for a minor's services is presumed to be in the father. But the father may voluntarily relinquish this right to the child. This is called 'emancipation.' This agreement may be expressed or implied from the circumstances. The father may do this although insolvent. In such case payment by a third person of a minor's wages to him is valid."

In this case it appears that the emancipation was express. H. J. Dunavant testified as follows:

"I have made a lot of contracts, both good and bad, before I was twenty-one years of age. When I first started into business my father told me that I could have all I made."

This statement of Dunavant, Jr., is corroborated by the father, S. D. Dunavant, and other witnesses.

"Emancipation gives the child a right to his own time and wages, and the control of his own person, and discharges a parent from obligation to support, unless the child becomes unable to support himself. It may be in writing or by parol, for the whole minority or part of the time." Browne, Dom. Rel. p. 85. "The child's earnings cannot, after emancipation, be recovered by the father, although he has notified the employer not to pay the child. Nor can the father's creditors attach them, although he is insolvent; and after emancipation the father may deal with the child as a stranger." Id. p. 86; Campbell v. Campbell, 11 N. J. Eq. 268; McCloskey v. Cyphert, 27 Pa. St. 220; Stanley v. Bank, 115 N. Y. 122, 22 N. E. 29; Bray v. Wheeler, 29 Vt. 514; Chase v. Elkins, 2 Vt. 290; Lackman v. Wood, 25 Cal. 147. The emancipation may be implied from circumstances. See Beaver v. Bare, 104 Pa. St. 58; Ream v. Watkins, 27 Mo. 516. The emancipation may be complete, although the child continues to reside with parents. Rush v. Vought, 55 Pa. St. 437; Beaver v. Bare, 104 Pa. St. 58. "A minor who works for his father after his time has been given to him may recover for his wages." Gen. Dig. p. 788.

In Halliday v. Miller, 29 W. Va. 426, 1 S. E. 829, the court says:

"It is universally agreed that the father may voluntarily relinquish his child's earnings, though he be a minor, and allow him to earn for himself, and receive and appropriate his own earnings at his pleasure. Such an arrangement between the father and his minor son is an emancipation of the son. By such an agreement the son is put, as to his services, on the same footing as if he had attained the age of twenty-one years, when the law would emancipate him. Such emancipation by the father may be by parol or in writing, and it may be proved by circumstantial evidence or it may be implied. The right of the father to emancipate his minor son is unquestionable, and this right exists though the father be insolvent." Campbell v. Cooper, 34 N. H. 49; Cloud v. Hamilton, 11 Humph. 104; Armstrong v. McDonald, 10 Barb. 300; Atwood v. Holcomb, 39 Conn. 270; Lackman v. Wood, 25 Cal. 147; McCloskey v. Cyphert, 27 Pa. St. 225; Dierker v. Hess, 54 Mo. 250; Hall v. Hall, 44 N. H. 293; Chase v. Elkins, 2 Vt. 290.

"The father may emancipate his child whenever he chooses to do so. That right is not within the control of his creditors, and they cannot prevent an insolvent father from relinquishing all right to the future services or earnings of his child." Penn v. Whitehead, 17 Grat. 503; Bobo v. Bryson, 21 Ark. 387; Wilson v. McMillan, 62 Ga. 16; Penn v. Whitehead, 94 Am. Dec. 478; Bobo v. Bryson, 76 Am. Dec. 406; Trapnell v. Conklyn (W. Va.) 16 S. E. 570. "The father of a minor whom he has emancipated is not entitled to his earnings during his infancy, nor damages recoverable by the infant after majority for a tortious act committed during his infancy." Blumenthal v. Shaw, 23 C. C. A. 590, 77 Fed. 954. It appears from the evidence in this case that the money invested in the purchase of the land in controversy was the money of young Dunavant, and was used by him in good faith, and with no purpose or intention of defrauding the creditors of S. D. Dunavant. Having been fully emancipated by his father, the profits accruing to him as a partner (receiving one-fourth from the Jamaica contract) belonged to him, and could be used in any manner

he saw fit. The emancipation appears to me to have been amply sufficient to put creditors on notice that his earnings and profits were his own.

The referee further reports, "The plea of the statute of limitations, interposed by the bankrupt, is respectfully referred to your honor."

Code N. C. § 155, subsec. 9, reads as follows:

"An action for relief, on the ground of fraud or mistake, in cases which heretofore were solely cognizable by courts of equity (the cause of action in such cases not to be deemed to have accrued, until discovery by aggrieved party of the facts constituting such fraud or mistake), is barred within three years."

"If, by matter appearing on the face of the pleadings, the plaintiff either has no equity, or his remedy therefor is barred by force of a public statute, the objection is valid at the hearing, though not insisted on by plea or demurrer, nor relied on in the answer." Robinson v. Lewis, 45 N. C. 58. "Where the statute of limitations applies, it may be pleaded, or is ground for a demurrer to a bill in equity." Falls v. Torrence, 11 N. C. 412. "If it appears on the face of the bill that the plaintiff's case is barred by the statute of limitations, advantage may be taken of it by motion on the trial." Whitfield v. Hill, 58 N. C. 316, approved in Isler v. Dewey, 84 N. C. 345. If the bill alleged no matters to avoid the bar apparent on its face, it would be considered as stating no cause of action. 6 Enc. Pl. & Prac. 201.

The deed which is attacked in this case by Rice and Anderson, administrator, judgment creditors of Dunavant, bankrupt, as being invalid, and as having been procured by the bankrupt to defraud his creditors, bears date December 30, 1893. The subscribing witness to the said deed is Mr. I. T. Avery, who was the attorney of record for S. M. Rice, and took the judgment against Dunavant and in favor of Rice in the superior court of Burke county March 20, 1893. It is insisted by creditors that the statute can only begin to run from the date of the discovery of such fraud or mistake. Code N. C. § 155, subsec. 9, above quoted. Conceding that to be true, it appears from the evidence that all the material facts in this matter were known to the judgment creditors and their attorney of record more than three years before the filing of the petition in bankruptcy by Dunavant. "Where the creditor employs an attorney to collect his debt by suit, and all the facts made necessary by the bankrupt law to invalidate a preference gained by such suit are known to the attorney after he enters on such employment, the knowledge of the attorney is the knowledge of the creditor." Black, Bankr. 201; Mayer v. Hermann, 10 Blatchf. 256, Fed. Cas. No. 9,344; Rogers v. Palmer, 102 U. S. 263. It appears in this case that Mr. Avery's partner, Mr. W. C. Ervin, was attorney for the Piedmont Bank, and that the interlineation made in the deed drafted December 20, 1893, is in the handwriting of Mr. Ervin. Clearly, he must have known of the contract and the provisions of the said deed. The deeds of trust drawn on the 1st of June, 1891, and 5th of September, 1892, were drawn by one or the other of these attorneys. In the answers filed in this case by respondents Rice and Anderson, administrator, it is alleged that executions had been issued on their judgments in 1896, and a sale of Duna-

vant's interest made in September, 1896, so that it is manifest that all the material facts in this matter must have been within the knowledge of these respondents for more than three years, before the adjudication in bankruptcy of S. D. Dunavant. The plea of the statute of limitations in this case interposed by the bankrupt is sustained. The petition on the part of the judgment creditors, S. M. Rice and Anderson, administrator of T. I. Gillam, to sell the interest of the bankrupt, S. D. Dunavant, in the Catawba tract of land, is refused.