KIDD v. THOMAS A. EDISON, Inc.

(District Court, S. D. New York. February 10, 1917.)

1. PRINCIPAL AND AGENT ⬳102(1)—AUTHORITY OF AGENT—IMPLIED AUTHORITY.

An agent, authorized to engage a singer for a series of recitals to be given in connection with phonograph records of her voice to show the quality of reproduction, has apparent authority of an agent to engage singers for ordinary recitals, and can bind the principal to pay such singers, notwithstanding a restriction on his authority, not known to the singer, that he could contract for only such recitals as the dealers in the records would arrange and pay for.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 274, 347; Dec. Dig. ⬳102(1).]

2. PRINCIPAL AND AGENT ⬳92(1)—LIABILITY OF PRINCIPAL—NATURE.

The liability of a principal for the acts of his agent within the scope of his employment does not depend on consent by the principal or estoppel to deny consent, but is a survival from the ideas of status, which is now preserved from motives of policy.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 245, 592; Dec. Dig. ⬳92(1).]

At Law. Action by Mary Carson Kidd against Thomas A. Edison, Incorporated. On defendant's motion to set aside, on exceptions, a verdict for plaintiff. Motion denied.

This is a motion by the defendant to set aside a verdict for the plaintiff on exceptions. The action was in contract, and depended upon the authority of one Fuller to make a contract with the plaintiff, engaging her without condition to sing for the defendant in a series of "tone test" recitals, designed to show the accuracy with which her voice was reproduced by the defendant's records. The defendant contended that Fuller's only authority was to engage the plaintiff for such recitals as he could later persuade dealers in the records to book her for all over the United States. The dealers, the defendant said, were to agree to pay her for the recitals, and the defendant would then guar-

antee her the dealers' performance. The plaintiff said the contract was an unconditional engagement for a singing tour, and the jury so found.

The sole exception of consequence was whether there, was either any question of fact involved in Fuller's authority, or a fortiori whether there was no evidence of any authority. In either event the charge was erroneous, and the defendant's exception was good. The pertinent testimony was that of Maxwell, and was as follows: He intrusted to Fuller particularly the matters connected with the arranging of these "tone test" recitals. He told him to learn from the artists what fees they would expect, and to tell them that the defendant would pay the railroad fares and expenses. He also told Fuller to explain to them that the defendant would book them, and act as booking agent for them, and would see that the money was paid by the dealers; in fact, the defendant would itself pay it. He told him to prepare a form of contract suitable for such an arrangement with such artists as he succeeded in getting to go into it, and that he (Maxwell) would prepare a form of booking contract with the dealers. He told him to prepare a written contract with the artists and submit it to him (Maxwell), which he did. He told him that he was himself to make the contracts with the artists by which they were to be booked, that he was not to bring them to him (Maxwell), but that he should learn what fees they would demand, and then confirm the oral agreement by a letter, which would serve as a contract.

This is all the relevant testimony.

Joseph M. Hartfield, of New York City, for plaintiff.
Herman S. Hertwig, of New York City, for defendant.

LEARNED HAND, District Judge (after stating the facts as above). [1] The point involved is the scope of Fuller's "apparent authority," as distinct from the actual authority limited by the instructions which Maxwell gave him. The phrase "apparent authority," though it occurs repeatedly in the Reports, has been often criticized (Mechem, Law of Agency, §§ 720–726), and its use is by no means free from ambiguity. The scope of any authority must, of course, in the first place, be measured, not alone by the words in which it is created, but by the whole setting in which those words are used, including the customary powers of such agents. Lowenstein v. Lombard, Ayres & Co., 164 N. Y. 324, 58 N. E. 44; Lamon v. Speer Hardware Co., 198 Fed. 453, 119 C. C. A. 1. This is, however, no more than to regard the whole of the communication between the principal and agent before assigning its meaning, and does not differ in method from any other interpretation of verbal acts. In considering what was Fuller's actual implied authority by custom, while it is fair to remember that the "tone test" recitals were new, in the sense that no one had ever before employed singers for just this purpose of comparing their voices with their mechanical reproduction, they were not new merely as musical recitals; for it was, of course, a common thing to engage singers for such recitals. When, therefore, an agent is selected, as was Fuller, to engage singers for musical recitals, the customary implication would seem to have been that his authority was without limitation of the kind here imposed, which was unheard of in the circumstances. The mere fact that the purpose of the recitals was advertisement, instead of entrance fees, gave no intimation to a singer dealing with him that the defendant's promise would be conditional upon so unusual a condition as that actually imposed. Being concerned to sell its records, the venture might rightly be regarded as undertaken on its own account, and, like similar enterprises, at its own cost. The natural surmise would cer-

tainly be that such an undertaking was a part of the advertising expenses of the business, and that therefore Fuller might engage singers upon similar terms to those upon which singers for recitals are generally engaged, where the manager expects a profit, direct or indirect.

[2] Therefore it is enough for the decision to say that the customary extent of such an authority as was actually conferred comprised such a contract. If estoppel be, therefore, the basis of all "apparent authority," it existed here. Yet the argument involves a misunderstanding of the true significance of the doctrine, both historically (Responsibility for Tortious Acts: Its History, Wigmore, 7 Harv. L. Rev. 315, 383) and actually. The responsibility of a master for his servant's act is not at bottom a matter of consent to the express act, or of an estoppel to deny that consent, but it is a survival from ideas of status, and the imputed responsibility congenial to earlier times, preserved now from motives of policy. While we have substituted for the archaic status a test based upon consent, i. e., the general scope of the business, within that sphere the master is held by principles quite independent of his actual consent, and indeed in the face of his own instructions. Of federal cases the following are illustrative: Insurance Co. v. Wilkinson, 13 Wall. 222, 20 L. Ed. 617; Insurance Co. v. McCain, 96 U. S. 84, 24 L. Ed. 653; Gt. Northern Ry. v. O'Connor, 232 U. S. 508, 34 Sup. Ct. 380, 58 L. Ed. 703; Butler v. Maples, 9 Wall. 766, 19 L. Ed. 822 (obiter); Dysart v. M., K. & T. Ry., 122 Fed. 228, 58 C. C. A. 592; Lamon v. Speer Hardware Co., 198 Fed. 453, 119 C. C. A. 1; Foster v. C., C., C. & St. L. Ry. Co. (C. C.) 56 Fed. 434. These were, it is true, all cases in which the third person took some action upon the faith of the agent's authority, and it is possible to speak of them as though they were cases of estoppel, but in truth they are not. It is only a fiction to say that the principal is estopped, when he has not communicated with the third person and thus misled him. There are, indeed, the cases of customary authority, which perhaps come within the range of a true estoppel; but in other cases the principal may properly say that the authority which he delegated must be judged by his directions, taken together, and that it is unfair to charge him with misleading the public, because his agent, in executing that authority, has neither observed, nor communicated, an important part of them. Certainly it begs the question to assume that the principal has authorized his agent to communicate a part of his authority and not to disclose the rest. Hence, even in contract, there are many cases in which the principle of estoppel is a factitious effort to impose the rationale of a later time upon archaic ideas, which, it is true, owe their survival to convenience, but to a very different from the putative convenience attributed to them.

However it may be of contracts, all color of plausibility falls away in the case of torts, where indeed the doctrine first arose, and where it still thrives. It makes no difference that the agent may be disregarding his principal's directions, secret or otherwise, so long as he continues in that larger field measured by the general scope of the business intrusted to his care. Blumenthal v. Shaw, 77 Fed. 954, 23 C. C. A. 590; Palmeri v. Manhattan Railroad, 133 N. Y. 261, 30 N. E. 1001, 16 L. R. A. 136, 28 Am. St. Rep. 632; Quinn v. Power, 87 N. Y. 535, 41 Am. Rep. 392.

The considerations which have made the rule survive are apparent. If a man select another to act for him with some discretion, he has by that fact vouched to some extent for his reliability. While it may not be fair to impose upon him the results of a total departure from the general subject of his confidence, the detailed execution of his mandate stands on a different footing. The very purpose of delegated authority is to avoid constant recourse by third persons to the principal, which would be a corollary of denying the agent any latitude beyond his exact instructions. Once a third person has assured himself widely of the character of the agent's mandate, the very purpose of the relation demands the possibility of the principal's being bound through the agent's minor deviations. Thus, as so often happens, archaic ideas continue to serve good, though novel, purposes.

In the case at bar there was no question of fact for the jury touching the scope of Fuller's authority. His general business covered the whole tone test recitals; upon him was charged the duty of doing everything necessary in the premises, without recourse to Maxwell or any one else. It would certainly have been quite contrary to the expectations of the defendant, if any of the prospective performers at the recitals had insisted upon verifying directly with Maxwell the terms of her contract. It was precisely to delegate such negotiations to a competent substitute that they chose Fuller at all.

The exception is without merit; the motion is denied. .

