**Joseph P. CANGE, Plaintiff-Appellant,**

v.

**STOTLER AND COMPANY, INC., Defendant-Appellee.**

No. 86–1915.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1986.
Decided Aug. 6, 1987.

John G. Jacobs, Jonah Orlefsky, Susan R. Haerr, Plotkin & Jacobs, Ltd., Chicago, Ill., for plaintiff-appellant.

Thomas F. Kolter, Chicago, Ill., for defendant-appellee.

Before CUMMINGS and EASTERBROOK, Circuit Judges, and SWYGERT, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

Plaintiff, a resident of Alaska, has sued defendant Stotler and Company, a futures commission merchant ("FCM")[1] with its principal place of business in Illinois, to recover for "fraudulent and unauthorized trades for gold and silver futures contracts" charged to plaintiff's account with defendant. The defendant firm is apparently a partnership, although we are told

---

1. A "futures commission merchant" is an individual or firm "engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market and that, in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. § 2.

by plaintiff's counsel that it is registered as "Stotler and Company, Inc." with the Illinois Secretary of State Corporation Division. The complaint was based on federal question and diversity jurisdiction, 28 U.S.C. §§ 1331, 1332, and 1337, and consists of seven counts including five pendent state law claims. The complaint alleges misconduct of Dwight Wilson and Wilpadco, Inc., purportedly agents of defendant. Wilpadco was said to be wholly controlled by Wilson.

According to the complaint and plaintiff's affidavit filed in opposition to the motion to dismiss, plaintiff opened an account with defendant Stotler and Company through its agent Wilson and his company Wilpadco in early 1981 when a Stotler and Company Customer's Agreement was signed by one of defendant's partners and plaintiff. During four weeks in September 1982, nine unauthorized trades for the sale and purchase of gold and silver futures were charged to plaintiff's account with defendant, causing him losses of $59,150. These transactions were conducted by Wilson and Wilpadco, with commissions going to defendant. Plaintiff contends that he never traded in gold and silver futures. Wilson on his own initiative allegedly called plaintiff and told him of the first few trades and said they would be reversed since they were defendant Stotler and Company's mistakes. Plaintiff then discovered more unauthorized trades on his statement from defendant and in September and October 1982 notified Wilson who again told him that the trades were defendant's mistakes and would be reversed. The losses from the unauthorized trades remained on later statements but Wilson reassured him that defendant would refund the losses from those trades and later that the trades had in fact been reversed out but that plaintiff was misreading the statements.

When plaintiff's accountant discovered in August 1983 that the unauthorized trades still had not been reversed out, plaintiff wrote a letter to defendant requesting reimbursement and had that letter hand-delivered to Wilson. Allegedly, Wilson admitted that the trades were unauthorized and in late August 1983 he and Wilpadco apparently arranged for $15,483.21 to be transferred to plaintiff's account with defendant. Wilson also orally agreed to pay $5,000 a month into plaintiff's account with defendant to reimburse the remaining amount owed to plaintiff. When Wilson failed to make the September and October payments, plaintiff in November 1983 had Wilson sign an agreement to reimburse the rest of the charges plus interest in monthly payments of $1,000, with the first due on December 1, 1983. Wilson and Wilpadco are said to have acted with "express, implied or apparent authority" of defendant, and none of the three has made any subsequent payments to plaintiff.

The complaint charges violations of the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), common law fraud, breach of fiduciary duty, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill.Rev.Stat. ch. 121½ ¶¶ 261–272), and breach of the repayment agreement.

Prior to answering the complaint, defendant filed a motion to dismiss, relying on a one-year limitation clause in paragraph 14 of the Customer's Agreement with plaintiff, and in a reply memorandum filed in the district court also asserted that plaintiff's claim based on the repayment agreement (Count VII) was barred by paragraph 20 of the Customer's Agreement relieving Stotler and Company of any liability from activities of its independent agents. The district court agreed. *Cange v. Stotler and Co.*, No. 85 C 7664, Comm.Fut.L.Rep. (CCH) ¶ 23,176 (N.D.Ill. May 2, 1986) [Available on WESTLAW, DCT database]. The district judge treated the motion to dismiss as a motion for summary judgment because both parties referred to matters outside the pleadings. See Rule 12(b)(6) of Federal Rules of Civil Procedure. A judgment dismissing the case followed. We reverse.

## I

Absent estoppel, one-year contractual limitations period applies to this case.

Paragraph 14 of the Customer's Agreement provides as follows:

14. Customer agrees that any controversy between us arising out of this Agreement, regardless of the manner of resolution, shall be arbitrated, litigated (tried in a Court of Law), or resolved by a tribunal located in Illinois. Stotler agrees to reimburse me, should Stotler be unsuccessful in any such proceedings, for reasonable expenses incurred for such dispute or resolution over that which would have resulted in a locale in which Customer would have been entitled by law to dispute our differences. Customer agrees to pay all expenses, including attorney's fees, incurred by Stotler to defend any unsuccessful claim Customer brings against Stotler. *No legal or administrative action may be commenced by anyone arising out of this contract after one year after any claim arises.* Customer hereby expressly acknowledges that the Agreement contemplated hereby is an Agreement made in the State of Illinois (upon acceptance by Stotler in Illinois), and further, that by virtue of trading commodity futures in the account established hereby, by and through Stotler, Customer is transacting business in the State of Illinois; accordingly, Customer hereby expressly acknowledges and agrees that Customer has submitted and consents to jurisdiction of his person in the Courts of the State of Illinois and, thus, that Customer shall be amenable to service of summons and other legal process of, and emanating from, the State of Illinois, regarding this Agreement. (Emphasis supplied.)

Plaintiff contends that such a limitations period violates public policy. However, it is well settled that courts will ordinarily uphold contractual limitations periods of one year or more. *Florsheim v. Travelers Indemnity Co.*, 75 Ill.App.3d 298, 303, 30 Ill.Dec. 876, 881, 393 N.E.2d 1223, 1228 (1st Dist.1979); 1A A. Corbin, Corbin on Contracts § 218, at 311–312 (1963); see *Amoco Canada Petroleum Co. v. Lakehead Pipe Line Co.*, 618 F.2d 504, 505–506 (8th Cir. 1980) (upholding 6–month limitation in contract between two corporations of equal bargaining strength). This cause of action accrued in September 1982 and the two-year statute of limitations period now contained in the Commodity Exchange Act does not apply because it was only made applicable to causes accruing after January 11, 1983. 7 U.S.C. § 25(c)–(d).

█ Plaintiff's public policy argument is premised on the critical importance of a private right of action to enforce commodity laws. That principle has been recognized by the Supreme Court, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (finding implied private right of action under the Commodity Exchange Act), and explicitly endorsed by Congress when it created an express private right of action in 1982, codified at 7 U.S.C. § 25. See H.R.Rep. No. 565, 97th Cong., 2d Sess., pt. 1, at 56–57, *reprinted* in 1982 U.S.Code Cong. & Admin.News 3871, 3905–3906 ("The Committee is of the view that the right of an aggrieved person to sue a violator of the Act is critical to protecting the public and fundamental to maintaining the credibility of the futures market."). Plaintiff urges on the basis of this strong public policy in favor of a private right of action and § 178 of the Restatement (Second) of Contracts (1981) that the limitations term in paragraph 14 is unenforceable as contrary to public policy. However, Congress' silence on a limitations period for pre-January 11, 1983, causes of action shows its willingness to accept reasonable limitations periods rather than a strong policy in favor of some particular limitations period. Because Congress did not provide an express statute of limitations applicable to this cause of action, allowing the parties to contract for a shorter limitations period than that which would be borrowed from state law is not contrary to public policy, assuming the contracted-for limitations period is reasonable, as is the case here.

As to the three-year limitations period provided in the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill. Rev.Stat. ch. 121½ ¶ 270a(e)), plaintiff has been unable to cite any pertinent authority condemning a shorter limitations provision such as the one-year period provided in

paragraph 14 of the Customer's Agreement. *Florsheim* upheld a contracted-for limitations period of one year for a claim of breach of an insurance contract. 75 Ill. App.3d at 303, 30 Ill.Dec. at 881, 393 N.E.2d at 1228. Plaintiff has failed to demonstrate how enforcing a reasonable, contracted-for limitations period is contrary to the public policy of Illinois against fraudulent business practices, and thus the one-year limitations period also applies to the state law claims.

## II

### Estoppel may bar defendant from raising limitations defense.

The conduct complained of occurred from September 2 to 29, 1982, but plaintiff did not file his action until November 21, 1984, in Alaska state court and that suit was dismissed with the reservation of plaintiff's right to bring an action in Illinois. Defendant admitted in its motion to dismiss that for purposes of the limitations period plaintiff's suit was filed on November 21, 1984, the date the Alaska suit was filed. Defendant's Motion to Dismiss ¶ 5 (Sept. 27, 1985). The 2–year and 2–month delay in filing this lawsuit would bar plaintiff's first six counts based on the Customer's Agreement if it were not for the material issues of fact that exist concerning whether the conduct of defendant's agent Wilson equitably estopped defendant from asserting the defense of the limitations period.[2]

### A

■ The federal doctrine of equitable estoppel applies to actions brought in federal courts at law and equity. *Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 232–233, 79 S.Ct. 760, 761–762, 3 L.Ed.2d 770 (1959); see, e.g., *Heckler v. Community Health Servs.*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). This Court has interpreted *Glus* as recognizing that "the principle that no man may take advantage of his own wrongdoing was so deeply rooted in and integral to our jurisprudence that it should be implied in the interstices of every federal cause of action absent some affirmative indication that Congress expressly intended to exclude the application of equitable estoppel." *Bomba v. W.L. Belvidere, Inc.*, 579 F.2d 1067, 1070 (7th Cir.1978). Based on these precedents, it is clear that the federal doctrine of equitable estoppel applies to actions brought under the Commodity Exchange Act and we so hold.

Plaintiff's federal claims are based on an implied right of action—the causes of action having accrued prior to the enactment of the express right of action in 7 U.S.C. § 25—and we have held that the three-year limitations period in the Illinois securities laws applies to implied rights of action under the Commodity Exchange Act. *Andrews v. Heinold Commodities, Inc.*, 771 F.2d 184, 186 (7th Cir.1985). But the fact that a state limitations period is borrowed in this sort of action does not make inapplicable the federal doctrine of equitable estoppel. The Supreme Court has held in *Board of Regents v. Tomanio*, 446 U.S. 478, 483–486, 100 S.Ct. 1790, 1794–1796, 64

**2.** This case is before us as an appeal of the granting of a motion to dismiss/summary judgment motion prior to the filing of an answer to the complaint. The concurrence's unusual position that we should refrain from discussing the federal and state statutory claims merely because recovery may turn on the same facts that comprise Count VII would deprive plaintiff of his statutory rights. Of course multiple recoveries for the same injury will not be allowed but plaintiff can pursue in the district court his multiple theories entitling him to recover. It follows that our discussion of the reasons why those federal and state statutory claims were improperly dismissed is not dicta.

Additionally, the viability of the two counts alleging violations of the Commodity Exchange Act, which survive the bar of the contractual limitations period only due to equitable estoppel, may be of crucial importance because the existence of diversity jurisdiction is unclear. Stotler and Company is apparently a partnership and the citizenship of the various partners, necessary information for ascertaining the presence of diversity jurisdiction, is not alleged in the complaint. See *Stockman v. LaCroix*, 790 F.2d 584, 586–587 (7th Cir.1986); *Elston Investment, Ltd. v. David Altman Leasing Corp.*, 731 F.2d 436 (7th Cir.1984). To remand without deciding the issues in Part II could result in unnecessary piecemeal litigation if diversity jurisdiction is later determined to be missing.

L.Ed.2d 440 (1980), and *Johnson v. Railway Express Agency*, 421 U.S. 454, 463–464, 95 S.Ct. 1716, 1721–1722, 44 L.Ed.2d 295 (1975), that in actions subject to 42 U.S.C. § 1988 when a federal court borrows a state statute of limitations it also borrows the state rules of tolling. We have interpreted these decisions as not preventing reliance on the federal equitable tolling doctrine, as well as state tolling doctrines, in implied rights of action under federal securities laws, *Suslick v. Rothschild Securities Corp.*, 741 F.2d 1000, 1004–1006 (7th Cir.1984); see *Teamsters Local 282 Pension Trust Fund v. Angelos*, 815 F.2d 452, 456–457 (7th Cir.1987) (following *Suslick* ); see also *Tomera v. Galt*, 511 F.2d 504, 509 (7th Cir.1975),[3] but that result does not end our inquiry because here we are dealing with "the separate and distinct doctrine of equitable estoppel," *Bomba*, 579 F.2d at 1070.

 The existence of the federal doctrine of equitable estoppel is independent of the particular statute of limitations, whether it is federal or borrowed from state law, and thus we have to apply the federal doctrine to the two federal claims. As Judge Bauer explained for this Court in *Bomba:*

> Tolling, strictly speaking, is concerned with the point at which the limitations period begins to run and with the circumstances in which the running of the limitations period may be suspended. These are matters in large measure governed by the language of the statute of limitations itself.... Equitable estoppel, however, is a different matter. It is not concerned with the running and suspension of the limitations period, but rather comes into play only after the limitations period has run and addresses itself to the

circumstances in which a party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period. Its application is wholly independent of the limitations period itself and takes its life, not from the language of the statute, but from the equitable principle that no man will be permitted to profit from his own wrongdoing in a court of justice. Thus, because equitable estoppel operates directly on the defendant without abrogating the running of the limitations period as provided by statute, it might apply no matter how unequivocally the applicable limitations period is expressed.

579 F.2d at 1070. There we held that the federal statute of limitations, or more accurately the statute of repose, in the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1711, which then stated, "In no event shall any such action be brought by a purchaser more than three years after the sale," might bar equitable tolling but did not bar equitable estoppel. *Id.* 579 F.2d at 1069–1070; see *Cook v. Deltona Corp.*, 753 F.2d 1552, 1561–1563 (11th Cir.1985) (where pre–1979 version of 15 U.S.C. § 1711 provided that action had to be brought within 1 year of discovery of the omission and no later than three years after the disputed sale, equitable tolling was barred for 3 year provision but equitable estoppel still applies); *Darms v. McCulloch Oil Corp.*, 720 F.2d 490, 493–494 (8th Cir.1983) (same); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1042–1043 and n. 7 (10th Cir. 1980) (same).

The concurrence herein suggests that *Bomba* is no longer authoritative in view of the Supreme Court's decisions of *Wilson v.*

---

**3.** The later case of *Wilson v. Garcia*, 471 U.S. 261, 269, 105 S.Ct. 1938, 1943, 85 L.Ed.2d 254 (1985), did not materially change the principles set out in *Johnson* and *Tomanio* and considered by us in *Suslick;* therefore, it does not require our reconsideration of *Suslick.* The concurrence correctly notes that two of our recent cases have questioned *Suslick* 's holding that both federal equitable tolling and state tolling doctrines apply to implied rights of action under federal securities laws, see *Hemmings v.*

*Barian*, 822 F.2d 688, 690–691 (7th Cir.1987) (dicta); *Norris v. Wirtz*, 818 F.2d 1329, 1331–1332 (7th Cir.1987), but equitable tolling was only at issue in the latter case and there the majority relied on the federal law principles in *Suslick* and *Angelos*, which followed *Suslick*, to determine whether equitable tolling for fraudulent concealment was established based on the evidence at trial. *Norris*, 818 F.2d at 1334. Contrary to the suggestion in the concurrence, *Suslick* remains the law of this Circuit.

*Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Chardon v. Fumero Soto,* 462 U.S. 650, 661–662, 103 S.Ct. 2611, 2618–2619, 77 L.Ed.2d 74 (1983); *Tomanio,* 446 U.S. at 484–486, 100 S.Ct. at 1795–1796; and *Johnson,* 421 U.S. at 463–464, 95 S.Ct. at 1721–1722. See concurring opinion at pp. 34–36. However, none of those decisions dealt with equitable estoppel; those decisions only held that courts should borrow state tolling rules when borrowing state statutes of limitations.[4] None of them questioned the principle, settled in this Circuit after *Bomba,* that equitable estoppel is not a creature of the particular statute of limitations relied upon, and thus, unlike tolling rules, it is not a part of the legislative balancing of the conflicting interests of enforcement versus staleness of claims embodied in statutes of limitations. See *Johnson,* 421 U.S. at 463–464, 95 S.Ct. at 1721–1722. The federal doctrine of equitable estoppel reflects a "deeply rooted" principle of law, "older than the country itself," that courts will not permit a party to assert a defense, including the bar of a statute of limitations, if the defense would enable the party to take advantage of his or her own wrongdoing. *Glus,* 359 U.S. at 232–233, 79 S.Ct. at 761–762. "The principle is, that where one party has by his representations or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage." *Union Mutual Life Ins. Co. v. Wilkinson,* 13 Wall. (80 U.S.) 222, 233, 20 L.Ed. 617 (1800). This longstanding principle owes its existence to the nature of federal courts as tribunals of justice and not to a particular state or federal statute of limitations.

Having concluded that the federal doctrine of equitable estoppel is applicable to plaintiff's two federal claims,[5] we turn to *Bomba* for a statement of that doctrine:

> Though it is widely held that mere negotiations concerning a disputed claim, without more, is insufficient to warrant the application of equitable estoppel, ... the cases are legion that a promise to pay a claim will estop a defendant from asserting the applicable statute of limitations of the plaintiff relied in good faith on defendant's promise in forbearing suit.... Moreover, it is not necessary that the defendant intentionally mislead or deceive the plaintiff, or even intend by its conduct to induce delay.

579 F.2d at 1071. In *Bomba,* we held that issues of fact existed concerning equitable estoppel, requiring reversal of the grant of summary judgment on the basis of the statute of limitations, where defendant allegedly acknowledged violating federal disclosure requirements and offered to allow plaintiffs to rescind the land sale and in subsequent phone calls gave reassurances of a refund, but later retracted those promises. In *Thompson v. Phenix Insurance Co.,* 136 U.S. 287, 10 S.Ct. 1019, 34 L.Ed. 408 (1890), the Supreme Court held that a question of fact existed over equitable estoppel where the agent of an insurer told plaintiff that the company would pay the claim and repeated those assurances on several occasions because "it would be contrary to justice for the insurance company to hold out the hope of an amicable adjustment of the loss, and thus delay the action of the insured, and then be permitted to plead this very delay, caused by its course

---

4. In fact, even if those decisions applied to equitable estoppel, which they do not, this might not make inapplicable the federal doctrine of equitable estoppel. As already discussed, in implied federal securities actions tolling doctrines are borrowed from state law but *Suslick* holds that a federal doctrine of equitable tolling also applies. Of course, this appeal does not involve equitable tolling and we put aside for another day arguments over the correctness of *Suslick.*

5. Because the federal doctrine of equitable estoppel is based on deeply rooted common law principles, it is not surprising that it resembles Illinois principles of equitable estoppel. Contrary to the suggestion in the concurrence, the congruity of the federal and Illinois doctrines of equitable estoppel under the facts of this particular case would not justify our application of the Illinois estoppel doctrine to the federal claims. The correct theoretical approach has already been laid out in *Bomba,* and our ignoring it would invite future imprecise legal analysis (or mistaken pronouncements of the distinction's demise).

of conduct, as a defense to the action when brought." *Id.* 136 U.S. at 299, 10 S.Ct. at 1023.

■ The district court erred in ordering dismissal of the two federal claims because plaintiff's affidavit filed in response to the motion to dismiss set out material issues of fact creating a jury question whether defendant was estopped from raising the issue of the limitations period. Assuming the facts alleged by plaintiff to be true, a jury could conclude that defendant's agent Wilson caused plaintiff not to be concerned over the unauthorized trades by contacting him by telephone, informing him of them, and telling him that defendant Stotler and Company had caused the mistake and would reverse the losses. Upon plaintiff's inquiries in late September and October 1982 regarding additional unauthorized trades, Wilson assured plaintiff that they were a mistake and would be reversed. Over the next 10 months Wilson continued to lull plaintiff into not filing suit by assuring him that the charges were defendant's mistake and would be reversed and then that they had been reversed but plaintiff was simply misreading the statements. In August 1983, still within one year of the illegal conduct, Wilson again admitted the trades were unauthorized, arranged for part of the questioned amount to be paid in order to placate plaintiff with the appearance of settlement, and promised to refund the balance in monthly increments of $5,000. Wilson renewed this promise in September and October upon missing each payment and then signed a written agreement in November 1983 to pay the remainder owed in monthly increments of $1,000. Plaintiff brought suit in Alaska in November 1984, within one year after Wilson's failure to make the first payment on December 1, 1983.

■ As for the state law claims, under Illinois law, equitable estoppel can bar a defendant's assertion of the expiration of the limitations period. *Florsheim v. Travelers Indemnity Co.,* 75 Ill.App.3d 298, 304–305, 30 Ill.Dec. 876, 882–883, 393 N.E.2d 1223, 1229–1230 (1st Dist.1979); *Suing v. Catton,* 118 Ill.App.2d 468, 474–

475, 254 N.E.2d 806, 809–810 (3d Dist.1970). For example, in *Suing v. Catton* the court held that the conduct of the insurance company's agents created a jury question over waiver by estoppel of the statute of limitations when it was alleged that the agents showed constant concern over plaintiff's physical injuries, made a partial payment on the automobile damage claim, saying that the full amount had not been paid only because of a mistake on the Company's part and would be paid at the time of settlement of all claims, and told plaintiff 3 months after expiration of the statute that they would talk concerning settlement. *Id.* at 474–475, 254 N.E.2d at 809–810. The application of the doctrine of waiver by estoppel in *Suing* is consistent with the well-established rule that "[i]n situations where an insurer causes an insured to delay filing suit by holding out a reasonable hope of settlement, the insurer will be estopped from raising a limitations defense because it lulled the insured into a false sense of security." *Lee v. Ohio Casualty Ins. Co.,* 58 Ill.App.3d 1, 6, 15 Ill.Dec. 555, 559, 373 N.E.2d 1027, 1031 (4th Dist.1978); see *Cassidy v. Luburich,* 49 Ill.App.3d 596, 601–602, 7 Ill.Dec. 154, 157, 364 N.E.2d 315, 318 (1st Dist.1977); *Ciaccio v. North River Ins. Co.,* 17 Ill.App.3d 940, 942–943, 308 N.E.2d 860, 861–862 (3d Dist.1974); *O'Brien v. Country Mutual Ins. Co.,* 105 Ill.App.2d 21, 24–25, 245 N.E.2d 30, 31–32 (1st Dist.1969). In the present case, the conduct of defendant's agent was more likely to deter plaintiff from filing suit than that found sufficient in *Suing v. Catton* because the agent here promised full reimbursement and not merely to negotiate over the matter. Compare *O'Brien,* 105 Ill.App.2d at 24, 245 N.E.2d at 32 (one-year contractual limitations provision could be waived where defendant deters timely filing of suit by holding out "reasonable hope" of settlement based on negotiations and making of offer 2 days before period expired). The sizeable partial payment, the oral promises, and the written promise to pay the remaining balance also create an issue of fact concerning estoppel. A resolution of these factual issues is properly left to the jury. See *Lee,* 58 Ill.App.3d at 6,

15 Ill.Dec. at 560, 373 N.E.2d at 1032; *Ciaccio*, 17 Ill.App.3d at 943, 308 N.E.2d at 862.

### B

The district court here erred in holding that defendant could not be estopped from asserting the limitations period due to defendant's lack of knowledge of or participation in its independent agent's conduct. Defendant admits that for purposes of this motion to dismiss or summary judgment motion Wilson must be assumed to be the agent of Stotler and Company, as the complaint alleges, and in fact there is much evidence to support the existence of an agency relationship: Wilson handled plaintiff's account with Stotler and Company; the Customer Agreement he gave plaintiff had Stotler and Company's name on it; the trades he executed on plaintiff's account were reflected on Stotler and Company confirmation slips and account statements; and Stotler and Company received commissions for executing the trades. *Nosser v. Northwest Commodities*, Comm.Fut.L. Rep. (CCH) ¶ 23,470 (CFTC ALJ Feb. 9, 1987); *Gadberry v. Daniels*, Comm.Fut.L. Rep. (CCH) ¶ 22,904, at 31,614–31,615. We concluded in *Rosenthal & Co. v. Commodity Futures Trading Commission*, 802 F.2d 963 (7th Cir.1986), that "the fact that [the commodity brokerage firm] was not shown to know about or be involved in or careless regarding [the agent's] fraud is irrelevant; the only question is whether the fraud was within the scope of his agency." *Id.* 802 F.2d at 967.

█ Plaintiff's first six counts are solely based on his losses from the alleged unauthorized trades made in violation of federal and state statutes and common law.[6] The Commodity Exchange Act prohibits the cheating or defrauding of investors, 7 U.S.C. § 6b, and the knowing and deliberate execution of unauthorized trades, even if not done out of an evil motive or intent to injure the customer, violates that prohibition. *Silverman v. Commodity Futures*

*Trading Comm'n*, 549 F.2d 28, 32–33 (7th Cir.1977); *Haltmier v. Commodity Futures Trading Comm'n*, 554 F.2d 556, 560, 562 (2d Cir.1977) (violation of 7 U.S.C. § 6b even if trades were undertaken by agent, "knowing them to be unauthorized but hoping that they would turn out profitably and thus pass muster with the client"); *Nosser*, Comm.Fut.L.Rep. (CCH) ¶ 23,470, at 33,-268; see 17 C.F.R. § 166.2. The unauthorized trades were made through plaintiff's account with defendant by defendant's agent in charge of that account and presumably were acts within the scope of Wilson's agency with Stotler and Company. The fact that the agent's actions were illegal and fraudulent does not relieve the FCM, as the agent's principal, of civil liability under the vicarious liability principles in 7 U.S.C. § 4. *Nosser*, Comm.Fut.L.Rep. (CCH) ¶ 23,470, at 33,628; *Gadberry*, Comm.Fut.L.Rep. (CCH) ¶ 22,904, at 31,615 (FCM required by 7 U.S.C. § 4 to pay reparations for customer's losses from trades made because of agent's misrepresentations of investment strategy). Nor does it matter that the FCM had no prior knowledge of the illegal acts and did not take commissions from the defrauded customer or otherwise benefit financially from the illegal acts. *Rosenthal & Co.*, 802 F.2d at 967, 969; *Ho v. Dohnen-Ramirez*, Comm. Fut.L.Rep. (CCH) ¶ 23,391, at 33,053 (CFTC Nov. 21; 1986) (Commodity Futures Trading Commission decision endorsing our analysis in *Rosenthal & Co.* of strict liability under 7 U.S.C. § 4 in customer's reparation suit based on FCM's agent's misrepresentation of trading strategy to be employed).

The unauthorized trades by Wilson could be found to be within the scope of his agency with Stotler and Company and so too could his conduct that is alleged to have caused plaintiff not to file suit within the one-year limitations period. Wilson's acknowledgments that the trades were unauthorized and that plaintiff's correct account balance was different from that shown on

---

6. Count VII is treated separately from the first six counts because it is based on the promise to pay in the repayment agreement and assumes

that the loss from the unauthorized trades is otherwise uncollectible. See *infra* Part III.

the account statements prepared by Stotler and Company could be found to be within the scope of his agency with Stotler and Company. For example, in a reparations case brought by a customer challenging unauthorized trades that an FCM's agent made, the Commodity Futures Trading Commission decided that the agent's admissions to the customer concerning the unauthorized nature of the trades, the consequent inaccuracies in the account statements issued by the FCM, and the amount owed, as reflected in a promissory note signed by the agent, were admissible against the FCM. The Commission reasoned that "since the reporting of equity balances is a matter generally within the scope of an account executive's agency, his statements relating to the amount in complainant's account are admissible against [the FCM]" to prove the FCM's liability for the losses. *Stoller v. Siegel Trading Co.,* Comm.Fut.L.Rep. (CCH) ¶ 22,224, at 29,204 (CFTC June 6, 1984).

■ Wilson's promises to plaintiff that the losses from the unauthorized trades would be refunded could also be found to be acts within the scope of his agency with defendant and, as such, would be admissible to estop defendant's assertion of a limitations defense. A customer has an "absolute right not to incur liability for any trade not authorized by him." *Sherwood v. Madda Trading Co.,* Comm.Fut.L.Rep. (CCH) ¶ 20,728, at 23,018 (CFTC Jan. 5, 1979); see *Hunter v. Madda Trading Co.,* Comm.Fut. L.Rep. (CCH) ¶ 21,242, at 25,205 (CFTC Sept. 2, 1981). The failure of the FCM's agent to inform the customer of this absolute right to a refund can defeat the FCM's otherwise valid defense, based on a customer's untimely request for a refund, that the customer ratified the trade. *Hill v. Bache Halsey Stuart Shields, Inc.,* 790 F.2d 817, 827–828 (10th Cir.1986); *Herman v. T & S Commodities,* 592 F.Supp. 1406, 1417–1419 (S.D.N.Y.1984); *Todd v. First Nat'l Monetary Corp.,* Comm.Fut.L.Rep. (CCH) ¶ 22,029, at 28,617 (CFTC ALJ Feb. 29, 1984); *Sturcken v. Clayton Brokerage Co.,* Comm.Fut.L.Rep. (CCH) ¶ 21,727, at 26,866–26,867 (CFTC ALJ May 10, 1983). Because the FCM or its agent must ensure

that the customer understands the right to a refund, it is expectable that when unauthorized trades occur, the FCM's agent handling the account will tell the customer that the losses from any unauthorized trades will be refunded and statements and promises to that effect could certainly be within the scope of the agency.

■ Here the trier of fact could find that Wilson's statements of the "correct" account balance and his promises of a refund for the unauthorized trades were acts within the scope of the inherent agency power of a person like Wilson handling a customer's account for an FCM. See Restatement (Second) of Agency §§ 8A, 161 (1958). Stotler and Company allowed Wilson to act as its agent in handling plaintiff's account, and absent proof that Stotler and Company informed plaintiff that Wilson would not have the customary power of a person in a similar agency relationship, the defendant is bound by the acts of its agent no matter its secret limitations to the contrary. This Court has before observed that "[t]he powers of an agent are, prima facia, coextensive with the business intrusted to his care, and will not be narrowed by limitations not communicated to the person with whom he deals." *Lumbermen's Mut. Ins. Co. v. Slide Rule & Scale Eng'g Co.,* 177 F.2d 305, 309 (7th Cir.1949); see *Butler v. Maples,* 9 Wall. (76 U.S.) 766, 776, 19 L.Ed. 822 (1869) ("[A] principal is bound by all that his general agent has done within the scope of the business in which he was employed, and this, though the agent may have violated special or secret instructions given him, but not disclosed to the party with whom the agent deals."). Judge Learned Hand articulated this concept of inherent agency power when he upheld a jury verdict for plaintiff based on a contract the jury found to be an unconditional engagement for a singing tour despite the principal's instructions to its agent to engage the singer only for such recitals as he could later persuade record dealers to book her for, instructions which were not told to plaintiff. *Kidd v. Thomas A. Edison, Inc.,* 239 F. 405 (S.D.N.Y.1917), affirmed, 242 F. 923 (2d Cir.1917). He reasoned that the

scope of an agency must be measured "not alone by the words in which it is created, but by the whole setting in which those words are used, including the customary powers of such agents" and thus the contract was enforceable because "the customary implication would seem to have been that [the agent's] authority was without limitation of the kind here imposed." *Id.* 239 F. at 406. The principal benefits from the existence of inherent authority because "[t]he very purpose of delegated authority is to avoid constant recourse by third persons to the principal, which would be a corollary of denying the agent any latitude beyond his exact instructions." *Id.* 239 F. at 408; see Restatement (Second) of Agency §§ 8A comment a, 161 comment a (1958).

■ The trier of fact could find that it is within the customary authority of an FCM's agent handling a customer's account to make statements of the account's correct balance and to promise refunds for losses from unauthorized trades. Thus the plaintiff's reliance on those statements and promises, notwithstanding contrary figures listed on the account statement issued by Stotler and Company, could be found to be reasonable. As such, the plaintiff's failure to bring suit within the one-year limitations period could be found to be attributable to Wilson's statements, and Stotler and Company would be estopped from asserting the bar of the limitations period. Here there were triable issues of fact regarding whether Wilson's acts dissuading plaintiff from timely bringing suit were within the scope of Wilson's agency with defendant and therefore summary judgment should have been denied on the first six counts. See *Thompson v. Phenix Ins. Co.,* 136 U.S. at 299, 10 S.Ct. at 1023 (question of agent's authority as affecting equitable estoppel against defendant's assertion of limitations period depends on evidence at trial).

Defendant argues that Wilson lacked the "apparent authority" for his actions to estop Stotler and Company from asserting the bar of the limitations period. First, defendant argues that plaintiff has failed to show "a single action on Stotler's part to create apparent authority" of Wilson (Def. Br. 18), but plaintiff need not prove any actions on Stotler and Company's part besides its allowing Wilson to act as its agent for handling plaintiff's account because the trier of fact could find Wilson's statements within his inherent authority. Representations of the principal to the third party are central for defining apparent authority, but in contrast, inherent authority originates from the customary authority of a person in the particular type of agency relationship and no representations beyond the fact of the existence of the agency need be shown. See Restatement (Second) of Agency § 161 comment b (1958). Compare *id.* at § 8 with *id.* at § 8A. See generally *id.* at §§ 194–195 (inherent agency power can subject undisclosed principal to liability for acts of his or her agent).[7] Plaintiff has provided evidence of the existence of the agency and it is a triable issue of fact whether the acts fall within such an agent's customary authority; therefore, this first argument is meritless.

■ Defendant's second argument is that the Customer's Agreement notified plaintiff that Stotler and Company's agents lacked authority to bind Stotler and Company on matters concerning customers' complaints. Defendant's Br. 18. The defendant cites paragraph 2 of the Customer's Agreement, which states in bold-face type:

2. This contract is the entire Agreement between us and no provisions hereof shall in any respect be waived or modified unless in writing and signed by a Partner of Stotler and Company. Customer acknowledges that no person other than a partner has authority to modify or waive the provisions of the Agreement or

7. Inherent authority not only can differ from apparent authority but also from actual authority. Unlike actual authority, inherent authority cannot be limited by secret instructions to an agent restricting his or her customary authority. *Kidd v. Thomas A. Edison, Inc.,* 239 F. at 406; see Restatement (Second) of Agency §§ 8A, 161 comment b (1958). Although unresolved factual questions on inherent authority make the granting of summary judgment improper, plaintiff could also explore apparent and actual authority theories on remand.

to establish customs and practices of trading contrary to the terms of this Agreement.

This provision only affects the agent's authority to modify the Customer Agreement and does not itself address the agent's inherent authority to deal with the customer on matters of the account balance and refunds for unauthorized trades.[8]

Defendant claims that under paragraph 20 it notified plaintiff that it was not liable for the acts of its agents of which it has "no actual prior knowledge or participation." The concurrence apparently agrees with this position. See concurring opinion at p. 597. That paragraph states:

20. Customer acknowledges that Stotler's performance hereunder, as principals, may result from activities of independent agents for whose activities Stotler may be technically legally liable. Customer agrees to waive any claims against, and to indemnify, defend, save and hold free and harmless Stotler for any activities of its independent agents or their employees of which Stotler has no actual prior knowledge or participation, and for any activities of Non-Employee Commodity Pool Operators or Commodity Trading Advisors.

This paragraph is an exculpatory clause purporting to relieve defendant of liability for damages caused by its agents for which it would otherwise be responsible, and, as such, it must be strictly construed. See *United States v. Seckinger*, 397 U.S. 203, 210–213, 90 S.Ct. 880, 884–886, 25 L.Ed.2d 224 (1970); *Edward E. Gillen Co. v. United States*, 825 F.2d 1155 (7th Cir.1987). By its own terms, paragraph 20 only applies to actions of agents that create liability on Stotler and Company's part. It does not apply to the agent's acts and statements that may estop Stotler and Company from asserting a defense, as opposed to creating liability in the first instance. For purposes of the first six counts of plaintiff's complaint, liability is based solely on the unauthorized trades and not on Wilson's conduct subsequent to the trades. Defendant conceded at oral argument that paragraph 20 could not relieve it of liability for Wilson's actions that violated the Commodity Exchange Act because such effect would be contrary to public policy as embodied in 7 U.S.C. § 6b, which proscribes unauthorized

---

**8.** Defendant argues in its brief that plaintiff failed to notify Stotler and Company as required by paragraph 6 of the Customer's Agreement and as reiterated, though with less clarity, on the trade confirmation slips. Def. Br. 7, 19. That paragraph requires that all complaints be made in writing and sent to Stotler and Company's Compliance Department in Chicago. Cases have held that oral notice to defendant's agent handling the customer's account is sufficient to put the FCM on notice of the unauthorized trades, even when there is a contract provision requiring written notice to the FCM. *Baker v. Stotler & Co.*, Comm.Fut.L.Rep. ¶ 21,994, at 28,-373 (CFTC ALJ Jan. 31, 1984); *Blome v. R.G. Dickinson & Co.*, Comm.Fut.L.Rep. ¶ 21,916, at 27,969–27,970 (CFTC ALJ Nov. 18, 1983); see *Union Ins. Exchange v. Gaul*, 393 F.2d 151, 154 (7th Cir.1968) (knowledge an agent acquires while acting within the scope of his or her agency is imputable to the principal, even if the agent fails to disclose it to the principal). Thus this paragraph does not change the agent's inherent authority to handle customer complaints.

It also has been held that the FCM's agent's conduct can amount to a waiver of the no-waiver provision in the contract and *a fortiori* the written notification provision. *Anspacher & Assocs., Inc. v. Haugen*, No. 83 C 3253 (N.D.Ill.

June 16, 1987) (Grady, J.) [Available on WEST-LAW, DCT database] (available on Lexis) ("If [the FCM's agent] assured [the customer] that he could handle all his problems with the accounts, and that he was the person to receive all reports of improprieties, he might be found to have waived not only the notification provisions of Section V of the Customer Agreement, but compliance with [the no-modification provisions of] Section III as well."); cf. also *Hill v. Bache Halsey Stuart Shields, Inc.*, 790 F.2d 817, 827–828 (10th Cir.1986) (jury's finding that customer did not ratify unauthorized trades by failing to object in writing was not wrong as a matter of law, even though the customer agreement signed by customer provided that "all statements of his account would be conclusive if not objected to in writing"). This is an application of the "general rule" in contract and agency law that "parties to a written contract may alter or modify its terms by a subsequent oral agreement even though the contract precludes oral modifications" and it is a question of fact whether a party's agents exceeded the scope of their authority by agreeing to the oral modifications. *Part v. Dealers Transit, Inc.*, 596 F.2d 203, 204–205 (7th Cir.1979). This rule recognizes that parties may, if they so choose, enter later contracts, written or oral, that trump earlier contracts.

trades, and 7 U.S.C. § 4, which imposes respondeat superior liability upon FCMs for just such acts of their agents. See *Rosenthal & Co.*, 802 F.2d at 966–967. Because paragraph 20 does not apply to the unauthorized trades, there is no conduct within the scope of paragraph 20 serving as the basis of liability under the first six counts and there is no occasion for plaintiff "to waive any claims against, and to indemnify, defend, save and hold free and harmless Stotler."

Paragraph 20 does not deprive defendant's agents of any inherent authority to make statements on customers' correct account balances and rights to a refund because such conduct does not create damages liability but merely recognizes the FCM's (and the agent's) liability if the underlying conduct creating liability—in this case the unauthorized trades—has actually occurred. If the trier of fact concludes that Wilson's conduct was within the scope of his agency authority, inherent or otherwise, and lulled plaintiff into inaction and that plaintiff's reliance on Wilson's conduct was reasonable, then estoppel would bar the assertion of the limitations defense. Paragraphs 2 and 20 of the Customer Agreement are irrelevant to this inquiry. Defendant's motion as to the first six counts should have been denied.

## III

### Repayment agreement Count VII is not barred by Customer's Agreement.

Count VII of the complaint seeks damages from defendant because defendant, Wilson and Wilpadco have not repaid plaintiff $43,666.79 of the $59,150 loss, plus 10% interest.[9] The repayment agreement was dated November 11, 1983, with the payments to begin on December 1, 1983. Plaintiff first filed his lawsuit in Alaska in November 1984, and that suit was dismissed without prejudice to permit plaintiff to refile the action in Illinois. Defendant has not argued that any limitations period with respect to the repayment agreement was exceeded. Therefore defendant relies solely on the previously quoted paragraph 20 of the Customer's Agreement to avoid liability under Count VII. See *supra* at p. 592.

The district court held that the repayment agreement was inconsistent with paragraph 20 of the Customer's Agreement and therefore dismissed Count VII. Defendant's brief in this Court relies on paragraph 20 and adopts the district court's reasoning that Stotler and Company could not be liable for breach of the repayment agreement because it had no prior knowledge of the agreement and could not be bound by the acts of its agent absent such knowledge. Defendant's Br. 6, 17, 19. However, at the oral argument, defendant conceded that under *Rosenthal & Co. v. Commodity Futures Trading Commission*, 802 F.2d 963 (7th Cir.1986), commodity brokerage firms cannot avoid liability for violations of the Commodity Exchange Act by their agents acting within the scope of their employment. 7 U.S.C. § 4. Moreover, defendant has conceded in its brief in this Court that "exculpatory clauses signed prior to the initiation of trading are unenforceable" (Br. 16).[10]

Defendant argues that those general propositions do not apply to its defense of Count VII because Wilson's entering the repayment agreement did not violate the Commodity Exchange Act and thus it can disavow such an act even if it is within the scope of its agent's authority. There is nothing in 7 U.S.C. § 4 limiting respondeat superior liability only to violations of the Commodity Exchange Act; rather, the fo-

---

9. The amount sought in Count VII is $52,400 plus interest at the rate of 10%. Since the repayment agreement of November 11, 1983 shows that the then unrecovered losses were $43,666.79, the sum of $52,400 apparently includes unpaid interest accrued to September 3, 1985, when the federal complaint was filed.

10. See *Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc.*, 465 F.Supp. 585, 593– 594 (M.D.La.1975), remanded on other grounds, 600 F.2d 1189 (5th Cir.1979); cf. *Commodity Futures Trading Comm'n v. Commodities Fluctuations System, Inc.*, 583 F.Supp. 1382, 1384–1385 (S.D.N.Y.1984) (commodity brokerage firm has duty to supervise its retail agents and cannot contract away that supervisory role to someone else).

cus of the statute is on whether the acts were within the scope of the person's agency. This conclusion is the same that we reached in *Rosenthal & Co.*:

> Section 2(a)(1) [(codified at 7 U.S.C. § 4)], which dates back to 1921, enacts a variant of the common law principle of respondeat superior.... The resemblance to the tort doctrine is so close ... and the language of the statute so clear—it expressly imputes the agent's wrongdoing to the principal—that we have no doubt that section 2(a)(1) imposes strict liability on the principal (Rosenthal), provided, of course, as the statute also states expressly, that the agent's misconduct was within the scope or (equivalently but more precisely) in furtherance of the agency.

802 F.2d at 966. We explained in *Rosenthal & Co.* that "[l]iability under this doctrine is strict, in the belief that employers and sometimes other principals can in the general run of cases prevent torts committed by their employees or agents in furtherance of the employment or agency" and it does not matter if in any particular case nothing could be done by the FCM to prevent the agent's wrongdoing. *Id.* 802 F.2d at 968–969. This statute embodies Congress' decision that the commodity markets will operate "better" if the FCM is responsible for the risk of loss from acts of its agents committed within the scope of their authority than if customers are liable. This could be attributable to a Congressional judgment that the FCM in most cases

can better police its agents than can customers or that the FCM faces less risk costs than customers from bearing this risk or can spread the losses more effectively than customers. Although there are many possible rationales for 7 U.S.C. § 4, it is sufficient for our purposes that Congress made an explicit statement in 7 U.S.C. § 4 that the FCM should be liable for all acts of its agents within the scope of their agency.

Plaintiff argues that paragraph 20 violates public policy. It could indeed be contrary to public policy by operating as a prospective waiver of the customer's right to hold the FCM liable for losses caused by its agents acting within the scope of their authority and thus tending to encourage violations of the law. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 3359 n. 19, 87 L.Ed.2d 444 (1985) ("[I]n the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."); *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 710, 65 S.Ct. 895, 903, 89 L.Ed. 1296 (1945) ("[C]ourts have uniformly held that contracts tending to encourage violation of laws are void as contrary to public policy." (footnote omitted)); *Redel's Inc. v. General Electric Co.,* 498 F.2d 95, 99 (5th Cir.1974).[11] The strong public policy in

11. The recent case of *Shearson/American Express, Inc. v. McMahon,* — U.S. —, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), is not to the contrary. That case upheld a contract provision in a securities customer agreement waiving a judicial forum in favor of arbitration based on the federal public policy favoring arbitration, as embodied in the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* 107 S.Ct. at 2337. The Court was guided by its earlier decision in *Mitsubishi Motors Corp.,* which concluded that an arbitration provision does not equate with the waiving of the substantive statutory right, 107 S.Ct. at 2339, and as we discussed in the text here that case recognized that an arbitration clause which operated as a prospective waiver of a substantive statutory right could violate public policy and be unenforceable. Other recent cases are distinguishable from the present dispute because they do not deal with prospective waivers

of substantive statutory rights. *Town of Newton v. Rumery,* — U.S. —, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987) (upholding waiver of section 1983 action after the occurrence of the events comprising the alleged constitutional violation); *Evans v. Jeff D.,* 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986) (upholding waiver of attorney's fees available under 42 U.S.C. § 1988 in a settlement agreement, when that agreement was entered after the occurrence of the alleged constitutional violations). Cf. generally *Ricketts v. Adamson,* — U.S. —, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987) (upholding defendant's waiver of double jeopardy protection in plea agreement exchanging testimony for dismissal of known greater charge, where such waiver would only occur if defendant later decided, as he did, to breach voluntarily the plea agreement). The waiver of substantive statutory rights after the violation has occurred is akin to a settlement of

favor of a private right of action to enforce the Commodity Exchange Act counsels against upholding a contractual clause as broad as paragraph 20 waiving the Act's provision for respondeat superior liability, when that clause is agreed to prior to the questioned transaction. See *supra* at p. 592. Because Congress viewed private lawsuits as "critical to protecting the public and fundamental to maintaining the credibility of the futures market," *supra* at p. 584, we cannot agree with the suggestion in the concurrence that substantive provisions under the Act are merely "bargaining chips" to be "traded" away in form contracts. Then again, this paragraph may just be an attempt to define the scope of the FCM's agent's authority instead of a prospective waiver of liability for acts admittedly within the agent's scope of authority.

We need not resolve this difficult question because narrower grounds make improper the granting of summary judgment against plaintiff on this count. The essence of Count VII is that the repayment agreement is itself enforceable against Stotler and Company, regardless of the collectibility of the losses from the unauthorized trades. The trier of fact could conclude that Wilson entered this agreement in furtherance of his agency with Stotler and Company. Although Wilson did not sign the repayment agreement as "an agent of Stotler and Company," that does not preclude Stotler and Company's contractual liability as a disclosed principal, unless Wilson and plaintiff intended otherwise. See Restatement (Second) of Agency §§ 149, 153, 155 (1958). The repayment agreement begins by stating: "The following trades were made in error to my Stotler & Co. account # 966 11167:" and then proceeds to list the nine unauthorized transactions and the losses incurred. The amount agreed to be paid is referred to as "the balance of the losses still unrecovered." The trier of fact could conclude that the parties intended that Stotler and Company,

the disclosed principal of Wilson, would be liable for this amount.

The district court erred in holding that paragraph 20 absolutely prevented Stotler and Company from being liable under the repayment agreement. Paragraph 20, if valid, relieves defendant for some acts of its agents that create liability, see *supra* at p. 592, but by its own terms does not apply to acts of which defendant had knowledge or in which it participated. If Wilson's signing the repayment agreement was within his actual authority, then paragraph 20 does not apply because defendant had "knowledge" of its agent's actual authority. With this the concurrence agrees. See concurring opinion at p. 598. Additionally, paragraph 20 does not cover acts within the agent's inherent authority. The establishing of Wilson as its agent to handle plaintiff's account was "participation" in any subsequent acts of Wilson that were within the scope of his inherent authority to execute that agency. The vague restrictions in paragraph 20 do not adequately notify Stotler and Company's customers that its agents lack the customary authority of agents of other FCMs to deal with complaints of unauthorized trades. The scope of Wilson's actual and inherent authority are issues of fact and cannot be resolved based on the present limited record. The district court should not have granted defendant's summary judgment motion against Count VII. Circuit Rule 36 will apply on remand.

Reversed and remanded for further proceedings consistent herewith.

EASTERBROOK, Circuit Judge, concurring.

Paragraph 20 of Stotler's contract with Cange relieves Stotler of liability arising from the unauthorized and unratified acts of Wilson and his firm Wilpadco. Stotler concedes that this clause is unenforceable under 7 U.S.C. § 4 to the extent it frees Stotler from liability for unauthorized trades. Cf. *Rosenthal & Co. v. CFTC*, 802

---

the dispute, but prospective waivers of statutory rights tend to encourage violations of the law by notifying the wrongdoer in advance that he or she can act with impunity; therefore prospective waivers uniquely can violate public policy.

F.2d 963 (7th Cir.1986). The concession may have been improvident, for neither § 4 nor *Rosenthal* deals with exculpatory clauses. *Rosenthal,* which enforced a decision of the CFTC, holds only that the CFTC may penalize a dealer for the sins of its agents. It does not say that a customer who has agreed to look to the agent rather than the principal for compensation may collect from the principal nevertheless. Unless Congress forbids such agreements by statute or the CFTC forbids them by regulation, they are like other contracts.

As Part I of the court's opinion holds, people may vary by contract many terms on which they will deal in the commodities trade. The securities laws contain no-waiver provisos, see 15 U.S.C. §§ 77n, 78cc(a), but the commodities laws do not. Cf. *Shearson/American Express, Inc. v. McMahon,* —— U.S. ——, 107 S.Ct. 2332, 2338–43, 96 L.Ed.2d 185 (1987) (parties may agree to arbitrate securities cases based on implied rights of action, even if the no-waiver rules would forbid agreements to arbitrate cases arising under the express rights of action, and may agree to arbitrate all RICO claims because that statute does not forbid waivers). The CFTC has forbidden some kinds of contractual waiver and set the terms on which others may occur; these regulations should make a court hesitate to forbid on its own initiative provisions that the CFTC has so far left alone.

The Supreme Court has not embraced decisions invalidating contracts on the rationale that they violate "public policy". E.g., *Ricketts v. Adamson,* —— U.S. ——, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987) (agreement to waive rights under the Double Jeopardy Clause of the Constitution); *Town of Newton v. Rumery,* —— U.S. ——, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987) (agreement to waive right to bring a suit under 42 U.S.C. § 1983); *Evans v. Jeff D.,* 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986) (a lawyer's agreement to waive his right to attorneys' fees under 42 U.S.C. § 1988). These cases do not embody a distinction between anticipatory waivers and subsequent ones (more accurately called settlements of existing disputes). They start from the premise that people

may strike such bargains as they please. Private bargains are subject to attack if enforcement would do too much damage to the statutory system, but this is rare and not a ground to refuse to enforce contracts generally. There is a difference between statutes that forbid waivers and those that do not. The former, but not the latter, interdict anticipatory alterations by contract. We must implement that difference.

Contracts rarely defeat the function of the statute so utterly that they may be set aside. A statutory right affects the initial bargaining position of the parties, so that the contract affords people the benefits of the statute even as it alters the rules. The beneficiary of the statutory right may enjoy it or trade it for something he prefers; when a court observes that the right has been surrendered (traded) in a contract, it may not leap to the conclusion that the statutory plan has been defeated. The contract tells us only that the parties valued something else more highly. To forbid the contractual waiver is to make the class of statutory beneficiaries worse off, by depriving them of the opportunity to obtain the benefits of the statutory entitlement by using it as a bargaining chip in the process of contracting. For example, Cange might have received the benefit of Stotler's greater willingness to *have* an agent in Alaska; the high costs of monitoring a distant agent may lead the principal to cut off dealing through agents if it cannot control its liability. Perhaps instead Cange received a lower rate of commission than Stotler would have required, if Stotler were absolutely liable for Wilson's doings. Having enjoyed the benefits of his contract, Cange cannot have absolute liability to boot. *Ricketts, Rumery, Evans,* and *Shearson* allow contractual surrender of express rights, including the right to file suit. In the long run, Learned Hand reminds us, it is better to enforce even one-sided commercial bargains than to tinker with their terms in the hope of improving things. *James Baird Co. v. Gimbel Bros., Inc.,* 64 F.2d 344, 346 (2d Cir.1933). Cf. Alan Schwartz, *Justice and the Law of Contracts: A Case for the Traditional*

*Approach,* 9 Harv.J.L. & Pub. Policy 107 (1986). The uncertainty such intervention induces affects everyone's terms of trade for the worse.

The majority distinguishes *Shearson* on the ground that it involved a contract for arbitration, a supposed favorite of the law. This is not a sound distinction. There was a long history of judicial hostility to arbitration contracts, even while courts were enforcing all other aspects of the most one-sided deals. The Federal Arbitration Act, 9 U.S.C. § 1 et seq., was designed to reverse "centuries of judicial hostility" to arbitration, *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 510, 94 S.Ct. 2449, 2452, 41 L.Ed.2d 270 (1973), not to make arbitration clauses more readily enforceable than other agreements. It puts arbitration clauses " 'upon the same footing as other contracts' ", *Scherk* 417 U.S. at 511, 94 S.Ct. at 2453, quoting from H.R.Rep. 96, 68th Cong., 1st Sess. 2 (1924). Section 2 of the Act is explicit: arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." See also *Shearson,* 107 S.Ct. at 2337. A contract to arbitrate surrenders a statutory right to judicial disposition of a claim; this is as much a prospective waiver of an entitlement as is a contract foreswearing resort to principles of vicarious liability; the question in either case is whether "grounds ... exist at law or in equity for the revocation of [this] contract."

The common law contains elaborate rules governing the enforceability of contracts. Cange does not rely on them, for good reason. As we said recently when enforcing a contract allowing a futures merchant to keep the interest on deposited funds: "People with sufficient financial savvy to invest in such speculative things as commodities futures should be able to understand such contractual provisions and, if they do not like them, negotiate something different.... Just as the Act permits investors to choose the trades they make, it permits them to arrange their relationship with their brokers" by contract. *Craig v. Refco, Inc.,* 816 F.2d 347, 348 (7th Cir.

1987). The common law makes it easy to avoid vicarious liability; people need only deal through "independent contractors." An explicit waiver of vicarious liability therefore should not send up storm warnings.

Still, we take concessions of parties seriously. Given Stotler's concession that Paragraph 20 may not properly relieve it from liability for Wilson's wrongdoing, the portion of the court's opinion addressing the enforceability of exculpatory clauses in general is *dictum.* I have addressed the subject at length only because the panel's unnecessary discussion should not be taken as truth accepted by all judges of the court. The same consideration leads me to question other unnecessary exposition in the majority's opinion.

Cange seeks to recover based on Wilson's promise as well as Wilson's wrongdoing. Stotler concedes the unenforceability of Paragraph 20 only to the extent it affects Stotler's liability for Wilson's misconduct; it relies on Paragraph 20 to fend off Cange's claim based on Wilson's promise of compensation. Even the express no-waiver provisions in the securities laws forbid only attempts to relieve people of duties imposed by statute. See *Shearson,* 107 S.Ct. at 2339 (statutes defeat only provisions excusing "compliance" with substantive rules). They do not forbid contractual definitions of the scope of agency. Suppose Paragraph 20 had said: "If we or one of our agents make a mistake in handling your account, we will compensate you for the loss you suffered. If our agent promises to pay more than your loss, that is the agent's business, and we are liable only for your actual loss." That would affect Stotler's responsibility for its agents' acts, but not in a problematic fashion. Such a clause would not affect Stotler's liability for any wrongs committed against Cange or undermine the deterrent force of the statute. If a truck driver runs someone down and promises on the spot to pay him $5 million, the driver's employer is liable only for the actual injury, not for the $5 million. If all Stotler wants to achieve by Paragraph 20 is to limit Cange's recovery to what Cange is

entitled to have, independent of Wilson's promise, the agreement is not forbidden by some overriding principle of federal law.

Yet Paragraph 20's "validity" ultimately does not matter. The majority ultimately says that the contract between Cange and Wilson is enforceable against Stotler only to the extent it reflects liability for trades that were in fact unauthorized. As I read the court's opinion, Stotler need not compensate Cange, contract or no contract, for trades that were in fact authorized—no matter Wilson's concession to the contrary. Some language looks in a different direction, such as the repeated references to an agent's "inherent authority" to do certain things. I do not understand my colleagues to add, to the categories of actual and apparent authority, the new brand of "inherent" authority. If a limit *known to third parties* confines the agent's actual authority, then there is also no authority at all. The third party (here, Cange) cannot get around this actual, known limitation by appealing to "inherent" authority. Neither agents nor third parties may engage in such bootstrapping.

Paragraph 20, valid or not, establishes in conjunction with several other provisions of this contract that Wilson did not have *apparent* authority to bind Stotler to such a promise. Wilson also did not purport to speak for Stotler; his promise to compensate Cange is signed only by Wilson as agent for Wilpadco. Stotler's name does not appear on the document. And if Wilson had actual authority, Stotler is on the hook under the terms of Paragraph 20. So I concur in the remand. The district court must decide whether Wilson had the authority to commit Stotler to pay Cange a sum that may exceed Cange's actual loss from unauthorized trades.

If Wilson had the authority to bind Stotler, then Cange recovers under the contract. The claim directly under the Commodity Exchange Act is superfluous. If Wilson did not have the authority to bind

Stotler, then Cange loses under the contract and *also* under the statute, for only Wilson's promises (and failure to pay) arguably permit Cange to sue so long after the last trade that Cange believes was unauthorized.[1] Equitable estoppel is possible only if Wilson's acts (the only bases on which estoppel has been urged) were within the scope of Wilson's agency. The court refers to Wilson's acknowledgments that there had been unauthorized trades and his unkept promises to reverse them—all unquestionably within Wilson's authority— but Cange did not sue within a year of any of these acts. Once Cange observed that the promises had not been kept, he was no longer being lulled into inaction and knew that he had to protect himself; he had a year to do so.

The only basis on which Cange could have waited as long as he did was Wilson's promise to compensate Cange and subsequent default. If the promise was outside the scope of Wilson's agency, Wilson's failure to pay cannot estop Stotler. So both the statutory and the contractual claims turn on the same issue—Wilson's authority to bind Stotler to pay Cange. Because the statutory claim is unnecessary if Cange recovers under the promise, cf. 7 U.S.C. § 25(b), the bulk of the discussion in Part II of the court's opinion is unnecessary. We need not discuss estoppel on a statutory claim that stands or falls with the contractual claim discussed in Part III.

The analysis of Part II also is questionable, although any flaws do not affect the outcome. My colleagues say that although state law supplies both the statute of limitations (or, more accurately, the principles by which the one-year period set by contract must be assessed) and the "tolling" rules, federal law supplies the "estoppel" rules. This distinction is unnecessary, because the cases collected *supra* at 588 show that the estoppel rules of Illinois are identical to the federal estoppel rules in

---

1. The court's opinion contains extended discussions of an agent's ability to vary the terms of his own agency, perhaps by making promises that directly contradict the text of the contract. Unreviewed decisions of administrative law judges supply the principal authority for these propositions. They are unnecessary to the opinion. The court can consider the propriety of these decisions when they are presented, and this is not such a case.

*Bomba v. W.L. Belvedere, Inc.,* 579 F.2d 1067, 1070 (7th Cir.1978). It is also inappropriate.

State law governs the period of limitations, if at all, only because of the Rules of Decision Act, 28 U.S.C. § 1652.[2] When state law supplies the statute of limitations, a federal court should take all of the state law governing tolling and estoppel. *Wilson v. Garcia,* 471 U.S. 261, 269, 105 S.Ct. 1938, 1943, 85 L.Ed.2d 254 (1985); *Chardon v. Fumero Soto,* 462 U.S. 650, 661–62, 103 S.Ct. 2611, 2618–19, 77 L.Ed.2d 74 (1983); *Board of Regents v. Tomanio,* 446 U.S. 478, 484–86, 100 S.Ct. 1790, 1795–96, 64 L.Ed.2d 440 (1980); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 463–64, 95 S.Ct. 1716, 1721–22, 44 L.Ed.2d 295 (1975); *Hemmings v. Barian,* 822 F.2d 688, 691–92 (7th Cir.1987); *Norris,* 818 F.2d at 1331. But cf. *West v. Conrail,* ——— U.S. ———, 107 S.Ct. 1538, 95 L.Ed.2d 32 (1987) (in a federal question case, the Federal Rules of Civil Procedure prevail over inconsistent state law dealing with commencement of actions). The doctrines of tolling and estoppel are related to the length of the period of limitations. A short period may be long in practice if there are generous doctrines of tolling and estoppel. Conversely, a court dealing with a long period of limitations—perhaps long because of concern that putative defendants would conceal their conduct and try to lull the plaintiffs into inaction—may find it appropriate to be strict with doctrines of estoppel and tolling. Liberal estoppel and tolling, tacked onto a long period of limitations, is double counting.

My colleagues say that tolling and estoppel are different. True enough, but it does not follow that federal law should govern estoppel even though state law governs tolling. Both doctrines affect the timeliness of suits and interact with the length of the period of limitations. The Supreme Court has not suggested that the formal difference between tolling and estoppel calls for the use of different sources of law. Its decisions look the other way. *Wilson,* for example, says that the federal court should borrow the state's period of limitations and "closely related questions of tolling and application" (471 U.S. at 269, 105 S.Ct. at 1943). *Chardon* incorporates the state rule that filing a class action renews (rather than suspends or interrupts) the statute of limitations, see 462 U.S. at 661–62, 103 S.Ct. at 2618–19. And *Johnson* was explicit:

> Any period of limitation ... is understood fully only in the context of the *various circumstances* that suspend it from running against a particular cause of action. Although any statute of limitations is necessarily arbitrary, the length of the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones. In virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling, *revival,* and *questions of application.* In borrowing a state period of limitation for application to a federal cause of action, a federal court is relying on the State's wisdom in setting a limit, *and exceptions thereto,* on the prosecution of a closely analogous claim.

2. Both sides assume that state law governs the period of limitations. Usually, however, resort to state law stems from the fact that Congress creates rights of action but omits any federal period of limitations. The securities and commodities laws contain federal periods of limitation, and perhaps these should be our points of reference. See *Norris v. Wirtz,* 818 F.2d 1329, 1331–32 (7th Cir.1987), suggesting that in securities cases under implied private rights of action courts should use the period of limitations Congress provided for the most closely analogous express right of action. See also, e.g., *Agency Holding Corp. v. Malley-Duff & Associates, Inc.,* ——— U.S. ———, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (borrowing the period of limitations in the federal antitrust laws for use in RICO cases); *DelCostello v. Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (borrowing a federal period of limitations for hybrid suits under 29 U.S.C. § 185); *Smith v. City of Chicago,* 769 F.2d 408 (7th Cir.1985) (borrowing a federal period of limitations for proceedings to enforce a federal consent decree). The parties have not briefed the matter, so I do not pursue it.

421 U.S. at 463–64, 95 S.Ct. at 1722 (emphasis added), quoted with approval in *Tomanio*, 446 U.S. at 485–86, 100 S.Ct. at 1795.

These cases do not allow a court to pick a tolling rule from state law and an estoppel rule from federal law. Rules governing interruption, renewal, revival, application, and similar exceptions must come from the same body of law that supplies the period of limitations. Cases in this circuit that predate *Wilson, Chardon, Tomanio*, and *Johnson* are no longer authoritative. The proposition that federal courts should "stack" the tolling periods of state and federal law is supported by *Suslick* but inconsistent with decisions of the Supreme Court. *Norris* and *Hemmings* reserve decision on this question because it was not briefed and did not affect the outcome. The question was not briefed (all parties relied wholly on state tolling rules) and does not affect the outcome here, either; the panel therefore properly reserves final judgment on the subject (587 n. 4). As none of this affects the disposition of today's case, I concur in Part I of the court's opinion and in the judgment.